## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| | § | |
| PATRICK THOMAS, | § | Civil Action 4:20-cv-1272 |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| COOK CHILDREN'S HEALTH CARE SYSTEM, | § | |
| COOK CHILDREN'S PHYSICIAN NETWORK, | § | |
| AND COOK CHILDREN'S MEDICAL CENTER, | § | |
| and in their individual and official capacities, | § | |
| RICK MERRILL, NANCY CYCHOL, W. BRITT | § | |
| NELSON, LARRY REAVES, and DONALD BEAM, | § | |
| | § | |
| Defendants | § | |
| | § | |

## ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff PATRICK THOMAS (hereinafter "Plaintiff" or "Dr. Thomas") by and through his attorneys, alleges the following against Defendants Cook Children's Medical Center, Cook Children's Physician Network and Cook Children's Healthcare System (collectively "Cook" or "Corporate Defendants") and in their individual and official capacities Rick Merrill, Nancy Cychol, W. Britt Nelson, Larry Reaves, and Donald Beam (collectively "Defendants" which includes Cook):

## NATURE OF ACTION

1.     Dr. Thomas, a board certified pediatric surgeon who has been recognized by his peers as one of the *Top Doctors of Fort Worth, Texas* by 360 West Texas Magazine multiple times and most recently in 2020, worked for joint employers Cook Children's Health Care

Center, Cook Children's Physician Network and Cook Children's Medical Center when he provided medical and surgical treatment for children at Cook Children's Medical Center for approximately 12 years until February 29, 2020.

2.     Dr. Thomas is an African American man who Defendants unlawfully terminated from his position as one of Cook's Senior Pediatric Surgeons because of his race and gender and because Defendants wrongfully regarded Dr. Thomas as having a disability in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et. seq. ("Title VII"), Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981, et. seq. ("Sec. 1981"), Americans with Disabilities Act of 1990, 42 U.S.C. § 1210, et. seq. ("ADA") and Chapter 21 of the Texas Labor Code.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

3.     Dr. Thomas exhausted his administrative remedies under federal and state law by filing a Charge of Discrimination on May 19, 2020, by both facsimile and electronic mail ("email"), with the Equal Employment Opportunity Commission ("EEOC"), an agency with a work-sharing agreement with the Texas Workforce Commission's Civil Rights Division.

4.     The EEOC issued a right-to-sue letter on Dr. Thomas's EEOC Charge No. 450-2020 04414 on September 2, 2020. This action is being commenced with the required time limits of Title VII and the ADA.

## JURISDICTION

5.     At all relevant times, Plaintiff has been a resident of the State of Texas and performed his duties and responsibilities as a Senior Pediatric Surgeon for Corporate Defendants in Fort Worth, Texas (U.S.A.).

6.      28 U.S.C. §§ 1331 confers jurisdiction upon this Court over Plaintiff's federal claims under 42 U.S.C. § 2000e-(5)(f)(3), 42 U.S.C. §1981, et seq., 42 U.S.C. §§ 1210, et seq., 29 U.S.C. § 1132(a) et seq., § 1002(3) et seq., § 1104, § 1109 et seq., and § 502 et seq.

7.      Plaintiff further invokes this Court's pendent jurisdiction, pursuant to 28 U.S.C. § 1367(a), over his claims under Chapter 21 of the Texas Labor Code as these claims are so related to the federal claims pled in this action that they form part of the same case and controversy.

## VENUE

8.      Venue properly lies in this District under 28 U.S.C. § 1391(a), (b) and (c), this being the District where the Defendants conducted business and the District where the plaintiff was employed by Cook at all relevant times.

## PARTIES

9.      Plaintiff Patrick Thomas is a citizen of the United States of America. At all relevant times, he was a resident of Fort Worth, Texas in Tarrant County.

10.      Defendant Cook Children's Health Care System ("CCHCS") is a nonprofit pediatric health care organization incorporated in the state of Texas and conducts business at 801 7th Avenue, Fort Worth, Texas, 76104.  At all relevant times, CCHCS employed 15 or more employees and has been comprised of approximately seven entities that includes Defendant Cook Children's Medical Center and Defendant Cook Children's Physician Network.

11.      Defendant Cook Children's Physician Network ("CCPN") is the largest pediatric physician group in North Texas, a nonprofit incorporated in the state of Texas and conducts business at 801 7th Avenue, Fort Worth, Texas, 76104. At all relevant times, CCPN employed 15

or more employees throughout Plaintiff's tenure.

12.     Defendant Cook Children's Medical Center ("CCMC"), also known as Cook Children's Hospital, is a not-for-profit hospital organized in the state of Texas and conducts business at located 801 7th Avenue, Fort Worth, Texas, 76104. At all relevant times, CCMC employed 15 or more employees.

13.     At all relevant times, CCHCS, CCPN and CCHC jointly exercised their position, power of control, and influence over the compensation, terms, conditions and privileges of Dr. Thomas employment as a Senior Pediatric Surgeon providing services at Cook Children's Hospital.

14.     At all relevant times, Defendants CCHSC, CCPN and CCMC were joint employers and were inextricably intertwined with respect to the compensation, terms, conditions and privileges of employment of Plaintiff and other similarly situated physicians who worked for CCMC through shared management, legal department, human resources, policies, procedures, work requirements, compliance and bylaws (hereinafter "employment").

15.     CCPN hired Plaintiff and other similarly situated physicians to work at Cook Children's Hospital through an employment contract which contained the compensation, terms, conditions and privileges of employment. The employment contract included physician bylaws, work requirements, board certification requirements to perform duties, an obligation to cooperate with Board of Directors of CCPN in the management and governance of CCPN business, including but not limited to, supervision of medical support personnel, business development efforts, and other voluntary participation in board committees and subcommittees, with CCPN's support and cooperation.

16.     At all relevant times, CCPN obligated its physicians, which included Dr. Thomas,

to comply with all written policies, procedures and protocols of CCPN to be a surgeon at CCHS. (Section 1.5 "Renewal Physician Employment Agreement").

17.    At all relevant times, CCMC provided medical and surgery services for children and Dr. Thomas provided pediatric surgery services at CCMC through an employment contract with CCPN.

18.    At all relevant times, CCPN was administered by and under the authority of CCHCS's compensation committee which had the authority to set the terms of Plaintiff's salary, bonus pay, emergency call pay and professional fees as examples.

19.    Defendant Rick W. Merrill ("Defendant Merrill") is a citizen of the United States of America, resides in the state of Texas, and is being sued in his official and individual capacity.

20.    At all relevant times, Defendant Merrill was President and Chief Executive Officer of CCHCS, exercised control over and influenced employment decisions that affected Plaintiff and similarly situated physicians, and was personally involved in the conduct complained of below.

21.    Defendant Nancy Cychol ("Defendant Cychol") is a citizen of the United States of America, resides in the state of Texas, and is being sued in her official and individual capacity.

22.    At all relevant times, Defendant Cychol was Chief of Hospital Services and Affiliate Ventures and President of CCMC, exercised control over and influenced employment decisions that affected Plaintiff and similarly situated physicians, and was personally involved in the conduct complained of below.

23.    Defendant W. Britt Nelson ("Defendant Nelson") is citizen of the United States of America, resides in the state of Texas, and is being sued in his official and individual capacity.

24.      At all relevant times, Defendant Nelson was President of Cook Children's Physician Network (CCPN), exercised control over and influenced employment decisions that affected Plaintiff and similarly situated physicians, and was personally involved in the conduct complained of below.

25.      Defendant Larry E. Reaves ("Defendant Reaves") is a citizen of the United States of America, resides in the state of Texas, and is being sued in his official and individual capacity.

26.      At all relevant times, Defendant Reaves was Chair of Peer Assistance Committee for Defendant CCHCS and Chair, Plastic Surgery in the Division of Surgery, exercised control over and influenced employment decisions that affected Plaintiff and similarly situated physicians, and was personally involved in the conduct complained of below.

27.      Defendant Donald Beam ("Defendant Beam") is a citizen of the United States of American, resides in the state of Texas and is being sued in his official and individual capacity.

28.      At all relevant times, Defendant Beam was Chair of Joint Credentials Committee (CCHCS) and Vice President of Credentialing CCHCS, exercised control over and influenced employment decisions that affected Plaintiff and other physicians, and was personally involved in the conduct complained of below.


## STATEMENT OF FACTS

29.      For approximately 12 years until February 29, 2020, Dr. Thomas, an African-American man worked as a board-certified Senior Pediatric Surgeon for his joint employers Defendants Cook Children's Health Care System, Cook Children's Medical Center and Cook Children's Physician's Network (collectively "Cook").

30.      Dr. Thomas has received numerous awards and accolades for his successes as a

pediatric surgeon.

31.    Dr. Thomas has been recognized by his peers as one of the *Top Doctors of Fort Worth, Texas* by 360 West Texas Magazine multiple times and most recently in 2020.

32.    Also Fort Worth Texas Magazine honored Dr. Thomas as one of the Top Doctors in Tarrant County and Fort Worth.

33.    At all relevant times, Dr. Thomas' board and other certifications included: American Board of Surgery in General Surgery and Pediatric Surgery as well as the American Heart Association Pediatric Advanced Life Support and Basic Life Support.

34.    All at relevant times, Dr. Thomas possessed the requisite skillset, work history, educational background as well as professional awards and honors to be reappointed by Cook for an additional two years (contract renewed) as a Senior Pediatric Surgeon at Cook Children's Medical Center.

35.    At all relevant times, Dr. Thomas was the only African-American Pediatric Surgeon at Cook.

36.    Dr. Thomas previously complained to Human Resources and Defendant Nelson, President of Cook Children's Physician Network ("CCPN"), that he was being targeted because of his race.

37.    But for Defendants' racial animus, Plaintiff would have remained employed by Cook as a Senior Pediatric Surgeon.

38.    On September 13, 2018, Dr. Thomas complained to Cook and Defendant Nelson that he was being discriminated against because of his race.

39.    Dr. Thomas made his September 13th complaint orally to Valerie Warren, Cook's Director of Employee Relations in Human Resources of Cook Children's Health Care System,

during an in-person meeting where Defendant Nelson was present.

40.    Cook and Defendant Nelson decided that they no longer wanted to employ Dr. Thomas in response to his complaint of racial discrimination.

41.    Defendants disregarded Cook's policies and procedures by immediately misusing "event reports" as a pretext to deny Dr. Thomas' reappointment.

42.    Cook's renewal of a pediatric surgeon's employment contract is a prerequisite for the surgeon to keep his credentials and treating privileges necessary to render patient care at Cook Children's Hospital.

43.    The purpose of event reports was to ensure the best care for patients at all relevant times.

44.    All event reports were to be investigated and addressed promptly to ensure the best care for patients.

45.    Cook's event reporting system was intended to be a "*patient-centered*" way to "provide and maintain a system wide *Just Culture* process that *supports timely identification, analysis and reporting of out of the ordinary events*." (Emphasis added.)

46.    An event report (also known as a "Report" or "Incident Report) could be submitted by anyone employed by or unaffiliated with Cook to express a concern about an individual or a situation.

47.    Event reports could be filed anonymously as well.

48.    All pediatric surgeons working at CCMC have received even reports.

49.    Defendants secretly revived 12 closed "event reports" about Dr. Thomas dating back to December 28, 2017 through September 6, 2018 after he complained of racial discrimination on September 13, 2018.

50.    Originally, Defendants determined that those 12 event reports were not important.

51.    Also, Defendants never informed Dr. Thomas about those 12 events reports until approximately a year later when his contract was due for renewal to be reappointed as a Senior Pediatric Surgeon.

52.    Defendants similarly never informed Dr. Thomas of the two complaints about him made on May 1, 2018 and August 13, 2018 until approximately one year later.

53.    The only event report that Cook informed Dr. Thomas about prior to his August 23, 2019 meeting with Defendants Nelson and Reaves involved an alleged HIPPA violation.

54.    Cook shared this one event report which alleged a HIPPA violation with Dr. Thomas soon after it was filed.

55.    The date of that event report alleging a HIPPA violation was February 1, 2019.

56.    Cook allowed Dr. Thomas to exercise his due process rights by allowing Dr. Thomas to both review that event report and respond to the allegations accusing him of violating HIPPA.

57.    Dr. Thomas responded to the HIPPA violation accusation against him.

58.    After the investigation, Cook found that Dr. Thomas had not violated HIPPA.

59.    However, Cook did not give Dr. Thomas timely notice about the other 18 event reports.

60.    Defendants did not provide Dr. Thomas with all of the18 redacted event reports and 2 complaints until October 7, 2019.

61.    10 of the redacted Reports involved post-operative orders and consents.

62.    With respect to those post-operative orders, Cook gave Dr. Thomas and similarly situated physicians the option to use either their universal pager or the Vocera system to be

contacted by nurses.

63.     Nurses were unable to reach Dr. Thomas when they attempted to contact him through the Vocera system about post-operative orders because Dr. Thomas permissibly used the universal pager.

64.     The event reports that involved alleged consents also lacked merit because emergency surgeries do not require electronic consents and Dr. Thomas also did not order a PICC line.

65.     Notably, 8 of the 18 Reports were subjective complaints that Dr. Thomas, the lead surgeon in his assigned operations, was intimidating while in the operating room.

66.     Defendants Nelson and Reaves admitted on a lawful tape recording that Dr. Thomas was "very reasonable" and "soft-spoken".

67.     Furthermore, Defendants Nelson and Reaves admitted on a lawful tape recording that Dr. Thomas had never displayed any of the alleged behavior complained of in the event reports about his personality.

68.     All defendants knew that Dr. Thomas was the only African American pediatric surgeon at Cook at the time those Reports were filed.

69.     Defendants nonetheless decided to use those uninvestigated and unsubstantiated event reports to stereotype Dr. Thomas as an *angry Black person who intimidated and scared staff in the operating room*.

70.     Defendants then bolstered this racial stereotype with gender animus by labelling Dr. Thomas as an *angry Black man who intimidated and scared staff in the operating room.*

71.     Defendants engaged in racial and gender stereotyping in an attempt to justify limiting Dr. Thomas's reappointment to 90 days instead of two years.

72.    On July 25, 2019, CCPN confirmed that Plaintiff had properly submitted the mandatory paperwork and information to be reappointed, and CCPN had processed Dr. Thomas' letters of recommendation.

73.    The following week on August 1, Defendant Nelson, the President of CCPN, emailed Dr. Thomas that he wanted Dr. Thomas to meet in-person with him and Defendant Reaves to discuss event reports from the operating room.

74.    Dr. Thomas met in-person with Defendants Nelson and Reaves on August 23, 2019.

75.    Defendants Nelson and Reaves allotted only 30 minutes to discuss with Dr. Thomas the 19 event reports that were allegedly about him on August 23, 2019.

76.    However, Defendants did not give Dr. Thomas the opportunity to review the event reports before his August 23rd meeting with Defendants Nelson and Reaves despite Defendants Nelson and Reaves being the ones who requested the meeting to discuss the 19 event reports.

77.    Cook along with Defendants Nelson and Reaves did not ensure that Dr. Thomas had copies of the event reports during his in-person meeting with Defendants Nelson and Reaves on August 23.

78.    Neither Defendant Nelson nor Defendant Reaves brought the event reports with them to their in-person meeting with Dr. Thomas on August 23.

79.    That August 23rd meeting was a sham.

80.    Cook permitted Dr. Thomas to tape record the August 23, 2019 meeting, and Defendants Nelson and Reaves made the following admissions:

a.    Defendant Nelson, President of Cook Children's Physician's Network,

identified himself as the one in charge of investigating event reports.

b.   Defendant Nelson admitted that no one at Cook ever contacted Dr. Thomas about the 19 events reports or interviewed him about them.

c.   Defendant Reaves, Chair of the Peer Assistance Committee, was unable to discuss any of the specifics about each report because he did not bring them to the meeting and did not know the respective details for each report.

d.   Both Defendants Nelson and Reaves asked Dr. Thomas to respond to the allegations contained in the event reports even though Defendants had denied Dr. Thomas the opportunity to review the actual event reports before and at the August 23, 2019 meeting.

e.   The allegations contained in the event reports about Dr. Thomas had not been verified or substantiated by Cook or Defendants Nelson and Reaves.

f.   Neither Cook nor Defendants Nelson and Reaves had investigated the event reports about Dr. Thomas prior to August 23, 2019 (except for the alleged HIPPA violation which was found to be unsubstantiated).

g.   Despite knowing that Dr. Thomas had not seen the event reports, Defendants Nelson and Reaves asked Dr. Thomas how he (Dr. Thomas) could change his behavior.

h.   At the close of the August 23rd meeting, Defendants Nelson and Reaves told Dr. Thomas that they would forward the event reports that they had to him.

81.    Defendant Reaves never provided Dr. Thomas with the event reports as promised during their August 23rd meeting.

82.    Dr. Thomas was unable to answer Defendants Nelson and Reaves' questions asked during the August 23, 2019 in-person meeting because Dr. Thomas had not seen the event reports.

83.    Dr. Thomas did not know that 18 event reports had been filed until August 23.

84.    Almost two weeks later, on September 4, 2019, Defendant Nelson finally emailed Dr. Thomas some, but not all, of the event reports.

85.    Defendant Nelson's September 4th email stated, in part, "We will set a meeting sometime soon to discuss this and next steps to make you successful. Please read these [event reports] as coaches giving you feedback on how you are perceived. Note that this stretches over several months. Also note the reticence to report because of fear and perceived lack of action."

86.    Defendants Nelson's September 4th email memorialized Defendants' position that the allegations contained in the event reports about Dr. Thomas were true and valid even though the allegations has not been substantiated.

87.    Cook still had not given Dr. Thomas the opportunity to respond to each event report.

88.    Cook then withheld from Dr. Thomas a letter that was signed and dated by Defendant Beam on September 19, 2019, who was Cook's Chair of the Hospital's Joint Credentials Committee.

89.    Defendant Beam's September 19th letter stated that Dr. Thomas's reappointment was for just 90 days.

90.    Instead of providing Dr. Thomas a copy of the Defendant Beam's September 19th letter, Cook scheduled another in-person meeting to be held on September 24, 2019 between Dr. Thomas and Defendants Nelson and Reaves to allegedly "discuss" the event reports with Dr. Thomas again.

91.    Cook still had not produced all of the event reports to Dr. Thomas for Dr. Thomas to review before he met with Defendants Nelson and Reaves on September 24, 2019.

92.     Cook allowed Dr. Thomas to tape record his in-person meeting with Defendants Nelson and Reaves on September 24, 2019.

93.     Dr. Thomas tape recorded that the following on September 24, 2019 at that meeting with Defendants Nelson and Reaves:

a.   Dr. Thomas told Defendant Nelson, President of the CCPN, that he had not heard back from HR's Valerie Warren about his claim of being targeted because of his race.

b.   Defendant Nelson stated on tape that he, Nelson, also had not heard back from Ms. Warren about Dr. Thomas' race discrimination complaint.

c.   Management also admitted on tape that receiving event reports could adversely "limit 'Dr. Thomas'" career if he received more event reports over the years even if "[he] may not be doing anything wrong".

d.   Management stated that "maybe it's a conspiracy" to explain why event reports had been filed against Dr. Thomas.

e.   Management admitted that it doesn't understand complaints alleging that Dr. Thomas is intimidating, instead management found Dr. Thomas to be "very reasonable" and "soft spoken".

f.   Management admitted that the goal was to "try to get both sides of the story. Now, of course, if it's anonymous, we can't ask anybody".

g.   Management stated that they were unable to conclude if the complaints made in the event reports about Dr. Thomas were "fair or unfair or legit or illegitimate."

h.   Defendant Nelson also instructed Dr. Thomas to give his staff "license" to "slap [him] around."

i.   Management admitted that the review process to determine whether an event report is significant or insignificant is subjective.

j.   Management admitted that there is not a written policy on how to process and resolve event reports lodged against a physician.

k.   Management admitted that there is a "hole in the system" with respect to how event reports are processed.

l.   Defendant Nelson continued that a submitted event report should go to Risk Management, the Medical Director and a member of upper management if the complaint involves a physician.

m.  Defendant Nelson also stated on tape that a filed event report could go to the physician's group, CCPN or Defendant Reaves.

n.   But Defendants Reaves and Nelson did not know whether Risk Management ever sent the event reports involving Dr. Thomas to his Medical Director or whether the Medical Director even knew "what he was supposed to do with them."

o.   In response, Dr. Thomas once again asked if there was a policy and a procedure on how to respond to and handle event reports that have been filed.

p.   Defendant Nelson responded, that he didn't know whether any policy or procedures have been "codified".

q.   Defendant Nelson continued that management's review of event reports are ad hoc, subjective and arbitrary, and there aren't any controls or objective measurements to adhere to when determining the validity of an event report.

r.   Defendant Reaves stated that he was supposed to be the Physician's Advocate in his role as Chair of the Peer Assistance Committee.

s.  Management said that the goal was to "try to get both sides of the story".

t.  Cook also did not attempt to get the identity of the person who submitted the event report.

u.  In fact, Defendant Reaves said on tape that he did not want to know the identity of the person who made the report even though that report concerned Dr. Thomas.

v.  Management confirmed that the process was to share the event report after it was received with the Physician to afford that doctor an opportunity to respond.

w.  Management also attempted to put the onus on Dr. Thomas to investigate complaints by staff that he had not seen and whose names have been kept confidential.

x.  Management admitted that it did not investigate the event reports against Dr. Thomas.

94.    Defendants Nelson and Reaves also admitted during that September 24th tape-recording that Dr. Thomas' performance was beyond satisfactory and that there had not been any quality issue with Dr. Thomas's work, which meant that there had not been any negative patient management outcomes or complications.

95.    Two days later on September 26, 2019, Defendant Beam finally emailed Dr. Thomas the September 19th letter which notified Dr. Thomas that he had only been reappointed for 90 days, rather than two years.

96.    Cook's September 19th letter, signed by Defendant Beam, stated that, "The Cook Children's Medical Center and Physician Network Joint Credentials Committee, the Cook Children's Medical Center Medical Board, and the System Board of Trustees Committee reviewed your application for reappointment in the September meeting. During this review the Credentials Committee received information that there were nineteen event reports and two

complaints during this reappointment period."

97.     Defendant Beam chaired the Joint Credentials Committee and was Vice President of Credentialing Cook Children's Health Care System at all relevant times.

98.     Cook's September 19, 2019 letter revealed that Cook already had decided to reappointment Dr. Thomas for only 90 days prior to Defendants Reaves and Nelson's meeting on September 24, 2019 to allegedly discuss the event reports with Dr. Thomas in-person.

99.     Defendants Nelson and Reaves did not discuss the two complaints about Dr. Thomas with Dr. Thomas when they met with Dr. Thomas on August 23, 2019 and September 24, 2019.

100.    Cook's Chief Legal Officer finally provided redacted copies of the 19 event reports and the two complaints to Dr. Thomas on October 7, 2019.

101.    Defendants had not given Dr. Thomas an opportunity to respond to complaints before he was reappointed for only 90 days.

102.    Cook assigned the Peer Assistance Committee ("PAC") to review the event reports and two complaints about Dr. Thomas and to make a recommendation about Dr. Thomas' reappointment as shown in Defendant Beam's September 19, 2019 letter addressed to Dr. Thomas.

103.    Section 14 of Cook Children's Medical Center Professional Staff Bylaws make clear that the Peer Assistance Committee ("PAC") focuses on the mental health and impairment of a practitioner.

104.    Section 14 all states that the PAC is "responsible for receiving, investigating, and acting on all Reports received by the committee regarding the *possible impairment of a Practitioner* or Allied Health Professional, including those reports received by self-referral".

(Emphasis added.)

105.    Furthermore, Section 14(5) states that the PAC is to "[m]ake recommendations to the Credentials Committee, including recommendation for leave of absence, corrective action or reinstatement, regarding a Practitioner or Allied Health Professional who cannot or will not document his/her health status as required…"

106.    Section 14(8) requires that the PAC "[m]ake recommendations to the Credentials Committee regarding policies and procedures on submission of reports regarding (1) the health or well being of a Practitioner or Allied Health Professionals, (2) the types of health and/or impairment issues to be considered, (3) the investigation process, intervention, monitoring, reinstatement, referrals, and record keeping processes."

107.    Section 14(D) requires that the PAC with "report to the Credentials Committee and shall provide written follow up, including the committee's findings and recommendations/actions, of all investigations to the Credentials Committee. Further, the committee shall make summary reports to the Medical Board."

108.    Cook should not have charged the PAC with reviewing or making a recommendation based on the 19 event reports and two complaints about Dr. Thomas because not one of those reports or complaints referenced Dr. Thomas having a suspected or actual mental health impairment.

109.    The PAC's recommendation(s) and action(s) taken as per Section 14(D) of Defendant CCMC's Professional Staff Bylaws can and impact a physician's ability to practice medicine at Cook and the impact the terms, conditions and privileges of employment at Cook.

110.    Upon learning of his limited credentialing and the PAC's involvement, Dr. Thomas complained in an email on September 27, 2019 about his good faith belief that Cook

was treating him differently than his similarly-situated peers because he is an African American man.

111.    Dr. Thomas also requested in his September 27, 2019 email that his 90-day limited reappointment be reversed and that Cook provide him with a host of written policies and procedures.

112.    Following Cook's receipt of Dr. Thomas' September 27, 2019 email Cook's Chief Legal Officer, Joseph Gallagher, prohibited Dr. Thomas' from exercising his right to complain to Human Resources, to his Medical Director and to his other superiors about his 90-day reappointment which Dr. Thomas found to be unlawful.

113.    Instead, Mr. Gallagher instructed Dr. Thomas in writing that Dr. Thomas could only express his concerns to directly to him, the Chief Legal Officer.

114.    Cook's Chief Legal Officer also wrote to Dr. Thomas on September 27, 2019 that the Cook would respond to Dr. Thomas' complaints of discrimination and provide the requested policies and procedures to Dr. Thomas by the end of the following week.

115.    Despite the assurances from its Cook's Chief Legal Officer, Cook did not respond to Dr. Thomas' complaints of discrimination or provide Dr. Thomas the requested policies and procedures.

116.    Three PAC (Peer Assistance Committee) delegates scheduled an in-person meeting with Dr. Thomas to be held on October 7, 2019.

117.    After Dr. Thomas' October 7th meeting with the three PAC delegates, Dr. Thomas emailed Cook's Chief Legal Officer because Defendants still had not provided him with all of the event reports or the two complaints.

118.    Also, Dr. Thomas complained in that same October 7th email to Cook's Chief

*Plaintiff's Original Complaint and Jury Demand*                                    19

Legal Officer that Cook had yet to respond to his September 27, 2019 email which asked questions and requested written policies and procedures.

119.    Plaintiff also requested information about the two complaints that Defendants now claimed had influenced his 90-day limited his reappointment.

120.    Right before the end of the day at 4:49 PM on October 7, 2019, Cook's Chief Legal Officer emailed Dr. Thomas the 19 event reports and two complaints but not the requested policies and procedures.

121.    Still, no one at Cook had yet to answer any of Dr. Thomas' questions asked in writing on September 27, 2019.

122.    On October 8, 2019, Defendant Reaves, the Chair of the PAC, wrote to Dr. Thomas that he hoped Dr. Thomas could "improv[e]" his "interpersonal relationships" with "co-workers…to be a successful and valued member of the pediatric surgery department."

123.    Defendant Reaves' also wrote on October 8, 2019 to Dr. Thomas that it was his "hope that [Dr. Thomas] will lean on [the Peer Assistance Committee] and be receptive to the assistance they are offering".

124.    However, Cook still had not given Dr. Thomas an opportunity to respond the event reports or the two complaints considering that Cook's Chief Legal officer had emailed those items to Dr. Thomas at 4:49 PM the day before.

125.    Also, in Defendant Reaves' letter dated October 8, 2019 to Dr. Thomas, Defendant Reaves admitted that it was short notice but Dr. Thomas was invited to appear and discuss the event reports and complaints about Dr. Thomas at the next scheduled PAC meeting in two weeks on October 23, 2019.

126.    In response, Dr. Thomas complained in writing to Cook's Chief Legal Officer on

October 9, 2019 about the escalating discrimination and retaliation that he was enduring.

127.    For example, Dr. Thomas complained that Cook had yet to give him the policies and procedures that he requested on September 27, 2019 and again on October 7, 2019.

128.    Notably, Cook's Chief Legal Officer previously informed Dr. Thomas in writing that he would respond to Dr. Thomas' requested information by October 4, 2019.

129.    Dr. Thomas also complained in his October 9, 2019 email to Cook's Chief Legal Officer that Cook's failure to give him the policies and procedures as well as other requested items "placed [Dr. Thomas] at a disadvantage to respond to and work with the peer assistance committee delegates to prepare for the peer review committee meeting on October 23 [, 2019]."

130.    Also, on October 11, 2019, Cook's Chief Legal Officer provided policies and procedures, but still had not answered Dr. Thomas' questions dating back to September 2019.

131.    Cook's General Counsel wrote Dr. Thomas on October 11, 2019, that the purpose of the PAC "is to investigate all reports received by them regarding the possible impairment or unprofessional conduct of a Practitioner, provide advice and assistance to the Practitioner, and make recommendations regarding referral resources to assist in the diagnosis and the treatment of any impairment or behavioral issues, as well as resources that may assist a Practitioner in improving his interpersonal relationships."

132.    However, the role of the PAC does not include investigating any and all allegations of "unprofessional conduct of a Practitioner".

133.    The PAC's focus is on actual impairment and suspected impairment as made clear in CCMS's Bylaws for Professional Staff and Cook's Policy Number MC 515.

134.    Cook's Policy MC 515 states, "The Peer Assistance Committee will be responsible for review and investigation of all matters involving impairment and will provide

advice and recommendations to the Credentials Committee as provide in this policy."

135.    Shortly before Dr. Thomas' in-person meeting with the three PAC delegates on October 14, 2019, PAC delegate, Chip Uffman, attempted to intimidate and silence Dr. Thomas from engaging in protected activity.

136.    On October 14, 2019, Mr. Uffman made an unannounced visit to Dr. Thomas' office to inform him that Cook's administration was getting nervous about Dr. Thomas' emails and said "[w]e want you here at Cook. But these emails aren't making it easy."

137.    On information and belief, Cook as well as Defendant Beam had shared and discussed Dr. Thomas' complaints of discrimination and retaliation with the three PAC delegates reviewing the 19 event reports and 2 complaints with Dr. Thomas.

138.    On information and belief, Cook as well as Defendant Reaves had shared and discussed Dr. Thomas complaints of discrimination and retaliation with the three PAC delegates assigned to Dr. Thomas' matter.

139.    Dr. Thomas met in-person with the three PAC delegates assigned to his matter on October 14, 2019 to discuss the 19 event reports and 2 complaints about him.

140.    During that October 14th meeting, PAC delegate, Dr. Maria Perez, attempted to minimize Dr. Thomas' claims of discrimination by stating that discrimination was to be accepted at Cook just like she had accepted being written up by Cook because of her race, ethnicity and gender.

141.    Dr. Perez also told Dr. Thomas that "[a]s an African American male [he would] have to work twice as hard here" and that she "kn[e]w this has been rough for [him] because she is a "Cuban woman".

142.    Dr. Perez made this admission on October 14, 2019 as both a Cook PAC delegate

and as a member of the Board of Trustees for Cook Children Physician Network.

143.    Also, during that October 14, 2019 in-person meeting the three PAC delegates, they and Dr. Thomas reviewed each event report and complaint against Dr. Thomas.

144.    Then on October 17, 2019, Dr. Thomas summarized in writing the discussion that he and the PAC delegates had on October 14, 2019 about the 19 event reports and two complaints.

145.    Cook's legal department informed Dr. Thomas that Dr. Thomas would have only 5 to 10 minutes to address the 19 event reports and 2 complaints at the in-person PAC meeting with him on October 23, 2019.

146.    Cook's allotment of just 5 to 10 minutes amount to approximately 15 to 30 seconds discuss each report and complaint on October 23, 2019.

147.    The October 23, 2019 PAC meeting with Dr. Thomas was yet another sham.

148.    Indeed, not one PAC member or person in attendance at that October 23, 2019 meeting asked Dr. Thomas one question or made a comment about the 19 event reports, 2 complaints or his written responses that Dr. Thomas had distributed to each attendee at the start of the meeting.

149.    In fact, Dr. Ray Rhodes, one of the three PAC delegates, admitted in writing on October 25, 2019 that no one from Cook's Peer Assistance Committee at the October 23, 2019 meeting had asked Dr. Thomas any questions about the allegations contained in the 19 event reports or two complaints.

150.    Dr. Rhodes further admitted in his same October 23, 2019 email to Dr. Thomas, "In many instances, as you point out, you were right with regard to the situation in an incident report".

151.    He also confessed that same October 23rd email to Dr. Thomas that, "Members of the Committee and medical staff office have nothing but positive interactions with [Dr. Thomas]."

152.    Nevertheless, Dr. Rhodes still found Dr. Thomas to be at fault without having a credible or objective reason for reaching such a conclusion.

153.    Dr. Rhodes stated at the Peer Assistance Committee meeting with Dr. Thomas on October 23, 2019 that Dr. Thomas' height was a "valid reason for a nurse to be intimidated".

154.    Dr. Thomas challenged Dr. Rhodes in writing that to permit Dr. Thomas' "height" to be a valid reason to submit an event report about him was "code for being a tall black male surgeon at this hospital because of the negative stereotypes that are assigned to me but not assigned to my similarly-situated white male peers who are taller than I. At last week's meeting, I responded to the group that I was sitting right next to one of my peers (Honeycutt) who is taller than I and Mayfield is also taller. *The only difference here is that [Drs.] Honeycutt and Mayfield are white, and I'm African American*." (Emphasis added.)

155.    Drs. Thomas, Honeycutt and Mayfield are similarly-situated pediatric surgeons who are both white males.

156.    Cook did not refer Drs. Honeycutt and Mayfield to the PAC to be reviewed or have recommendation about the terms, conditions and privileges of their employment because of their height.

157.    Cook did not permit Drs. Honeycutt and Mayfield's reappointment to be 90 days because of their height.

158.    Cook then withheld from Dr. Thomas the Joint Credentials Committee's November 14, 2019 letter which notified Dr. Thomas that Cook had adopted the PAC's

recommendation that Dr. Thomas: (1) meet with Cook's Valerie Gibbs on a weekly basis for an indefinite time "to get feedback on any interactional concerns" for an indefinite period; and (2) receive coaching for an indefinite period, and giving him until December 3, 2019 to select a coach.

159.    Despite Cook's December 3, 2019 deadline for Dr. Thomas to select a coach, Cook did not provide Dr. Thomas a copy of the Joint Credentials Committee's November 14, 2019 decision until November 21, 2019.

160.    In response to Cook's Joint Credentials Committee adopting of the Peer Assistance Committee's ("PAC") recommendations. He wrote:

> Anyone can and I predict will continue to lodge false complaints against me without consequence, and the hospital will continue to use such complaints as pretexts to discriminate and retaliate against me in furtherance of a scheme to ultimately deny my recredentialing that will end my tenure at the hospital. An immediate response to how the hospital has addressed my clear and reasonable concerns, all of which I previously expressed, is imperative…

161.    He also complained that Cook and its Peer Assistance Committee were "setting [him] up for failure" by waiting until Thursday, November 21, 2019 to inform him of the December 3, 2019 deadline due to the Thanksgiving holiday.

162.    Dr. Thomas wrote, in part, on November 22, 2019:

> Thursday, November 28, is Thanksgiving, and many take a full-day or half day the Wednesday day before and do not return until Monday, December 2. But the Peer Assistance Committee demands

that I secure a coach by December 3.

163.    On December 2, 2019, Dr. Thomas included the Defendant Merrill, President of the Cook Children's Health Care Center and other members of Cook's executive management about Cook's mistreat of him.

164.    Defendant Beam responded in writing on December 2, 2019, that Cook's imposed "timeline" was "inadvertently tightened due to the holidays…" and described the timeline as "standard practice".

165.    Notably, Dr. Thomas memorialized on December the Defendant Beam's December 2nd written respond failed to respond to all of Dr. Thomas questions and concerns raised in an email dated November 22, 2019.

166.    On December 4, 2019, Dr. Thomas requested any "written policy regarding the 'standard practice'" that Defendant Beam referenced and Dr. Thomas asked why it "wasn't immediately offered to [him] when everyone [was] aware of the holiday season."

167.    Two day later on December 6, Defendant Beam admitted in writing that a "written policy" did not exist.

168.    Five days later on December 11, Dr. Thomas wrote that Defendants' treatment of him was "subjective and arbitrary" and "discriminatory and retaliatory".

169.    In that same December 11th letter, Dr. Thomas informed Defendants that he had retained executive Coach Sola Winley of Brown Angel Advisors since Cook required that he receive coaching.

170.    Cook remained relentless in its unlawful attacks against Dr. Thomas, thereby creating a hostile work environment.

171.    Defendants did not adhere its own policies and procedures when interacting with

Dr. Thomas.

172.    On December 30, 2019, Cook's falsely claimed to Dr. Thomas that the PAC, led by Defendant Beam, had not completed its review.

173.    However, Cook's letter dated November 14, 2019 wrote that the PAC's review had concluded.

174.    Nonetheless, on December 30, 2019, Defendant Beam of Cook's Joint Credentials Committee wrote that the Peer Assistance Committee's "review is not yet complete" and extended Dr. Thomas reappointment at Cook for sixty days until February 29, 2020.

175.    Notably, Cook Children's Medical Center Board, Cook's Medical Center Board of Trustees and Cook's Physician Network Board of Directors approved Cook's ever-changing policies and procedures approved Defendant Beams' letter dated December 30, 2019.

176.    On January 6, 2020, Dr. Thomas complained about Cook's December 30, 2019 letter that Defendant Beam wrote, and Dr. Thomas requested that Cook answer the questions that he had asked six weeks earlier on November 22 as well as other material questions.

177.    On January 7, 2020, Dr. Thomas complained to Cook's Legal Department once more in writing that Cook still had not answered his questions about policies and procedures relating to the terms, conditions and privileges of his employment.

178.    Dr. Thomas' also wrote on January 7, 2020, to Cook's Legal Department that, "Cook continues to disregard the chain of events and instead has opted to cherry pick which of my questions and concerns that it will and will not respond to because I'm still waiting for them to be addressed dating back to the start of the most recent problems involving the 19 event reports."

179.    On January 9, 2019, Defendant Reaves wrote on behalf of Cook, in part, "**Let's**

**not focus on the validity of one report or another. The goal is to assist you to improve your ability to work with other staff in a cooperative and supportive manner.**" (Emphasis added.)

180.    Cook further imposed a host of demands which have never been required of a pediatric surgeon who was not a black pediatric surgeon.

181.    Dr. Thomas was the only employee required to participate in training, counseling and coaching for alleged interactions in the operating room found in event reports.

182.    Cook did not require anyone else in the operating room to participate in training, counseling or coaching based on the allegations contained in the 19 event reports involving Dr. Thomas.

183.    Attached to Cook's January 9, 2020 letter, Cook attached a document titled "Voluntary Agreement with Cook's Children's Medical Center Peer Assistance Committee".

184.    This "Voluntary Agreement with Cook's Children's Medical Center Peer Assistance Committee" was for Dr. Thomas to sign.

185.    This "Voluntary Agreement with Cook's Children's Medical Center Peer Assistance Committee" ("Voluntary Agreement") was summarized the PAC's recommendations for Dr. Thomas to implemented.

186.    Additionally, Cook's "Voluntary Agreement" was an instruct for Dr. Thomas to waive his rights and available remedies by having him (1) voluntarily agree to accept the PAC's recommendations; (2) voluntarily agree that such recommendations were not "corrective or disciplinary", and (3) voluntarily agree that he "had the benefit of legal counsel in deciding whether to enter into this voluntary agreement".

187.    On January 10, 2020, Dr. Thomas wrote yet another appeal to Cook, Defendant Merrill, Defendant Reaves, Defendant Beam, Beth Schmidt from Human Resources and other

Cook employees "about [Cook's] most recent acts of discrimination, retaliation and workplace harassment" based on Cook's ever-changing demands that Cook required of him to remained employed by Cook.

188.    On that same day, January 10, 2020, Beth Schmidt, Associate Vice President of Human Resources, temporarily departed from Cook's Chief Legal Officer directive to Dr. Thomas that Dr. Thomas could not contact Human Resources about his claims and dispute when Ms. Schmidt wrote to Dr Thomas:

> As AVP of HR I wanted to respond to your email dated today, January 10, 2020. In my position I am available to **any** employee who has concerns regarding policies, treatment or other employment related issues.

189.    On January 10, 2020, January 13, 2020 and January 17, 2020, Dr. Thomas submitted written explanations to Cook, Defendant Merrill, Defendant Reaves and Defendant Beam citing discrimination, harassment and retaliation as the reasons he would not the sign Cook's January 9, 2020 "Voluntary Agreement".

190.    Dr. Thomas carbon-copied Beth Schmidt of Cook's Human Resources and Cook's Chief Legal Officer his written explanations summarizing the reasons he would not sign Cook's "Voluntary Agreement" sent on January 10, 2020, January 13, 2020 and January 17, 2020

191.    On January 14, 2020, Defendant Merrill acknowledged in writing the receipt of Dr. Thomas January 13, 2020 email, and Defendant Merrill wrote that he would ensure that Dr. Thomas' concerns would be "most appropriately addressed".

192.    Defendant Merrill carbon-copied Cook's Chief Legal Officer, Defendants Reaves and Beam and others members of top management on his January 14, 2020 written

acknowledgement to Dr. Thomas.

193.    On January 15, 2020, Defendant Reaves, Chair of the PAC, emailed Dr. Thomas that "[t]he Peer Assistance Committee will forward the results of its review, its recommendations and [Dr. Thomas'] refusal to implement the recommendations to the Credentials Committee for consideration at its next meeting."

194.    On January 23, 2020, the PAC submitted a document about Dr. Thomas to the Joint Credentials Committee, which was Chaired by Defendant Beam.

195.    The PAC admitted in its January 23, 2019, letter that Cook had not required any other employee to agree to such terms and conditions for continued employment at Cook like it has demanded of Dr. Thomas.

196.    Furthermore, the PAC's January 23, 2019, letter contained numerous misrepresentations and false statements about Dr. Thomas and the events of the past year involving Dr. Thomas.

197.    Defendants wrongly regarded Dr. Thomas as having mental health disorder and/or being impaired.

198.    Cook scheduled a meeting with Dr. Thomas on February 5, 2020 for Dr. Thomas "to explain [his] decision not to sign the voluntary agreement" that was given to him on January 9, 2020 and to answer other unspecified questions.

199.    Notably, Dr. Thomas had already submitted written statements on January 10, 2020, January 13, 2020 and January 17, 2020 that set forth the reasons he would not sign Cook's "Voluntary Agreement" dated January 9, 2020.

200.    Dr. Thomas also requested in writing that Cook provide him with their questions in advance of the February 5, 2020 meeting to allow him to prepare.

201.    In response, on January 31, 2020, Defendant Reaves, Chair of the PAC, wrote to Dr. Thomas that a new event report had been filed about Dr. Thomas on January 27, 2020.

202.    Defendant Reaves informed Dr. Thomas that Dr. Thomas was required to provide a written response about the newest event report about him a day before Cook's February 5, 2020 meeting with Dr. Thomas.

203.    Cook, however, refused to provide Dr. Thomas with a copy of the newest event report.

204.    In response, Dr. Thomas wrote on February 3, 2020:

In your January 31, 2020 letter, you requested that I respond to an "event report filed regarding [my] conduct on January 27." I've been waiting for the event report to review so that I can prepare a response. However, Cook has not provided it yet.  It remains impossible to respond to an event report that I have not seen.

205.    Dr. Thomas was unable to respond to the alleged event report of January 27, 2020 because Cook refused to provide Dr. Thomas with that event report.

206.    To this day, Cook has not provided a copy of the event report of January 27, 2020 to Dr. Thomas.

207.    On information and belief, the January 27, 2020 event report regarding Dr. Thomas does not exist.

208.    On information and belief, any event report date January 27, 2020 about Dr. Thomas was submitted by the complainant.

209.    On the morning of February 5, 2020, Dr. Thomas provided those scheduled to attend Cook's February 5, 2020 in-person meeting the majority of correspondence exchanged

between him and Defendants about the discrimination, retaliation, harassment and hostile work environment that he had experienced, along with the policies and procedures that Cook's Chief Legal Officer had caused for Dr. Thomas to receive on October 11, 2019.

210.    Cook already had in its possession all of the documents that Dr. Thomas emailed to those scheduled to attend the meeting on February 5, 2020.

211.    The individually named Defendant already had access to the documents that Dr. Thomas emailed to those scheduled to attend the February 5, 2020 meeting.

212.    Cook asked Dr. Thomas only a few questions at the February 5, 2020 meeting and ended the meeting after approximately 15 minutes.

213.    Dr. Thomas complained in writing about Cook's February 5, 2020 meeting to Defendant Merrill, Cook's Chief Legal Officer and Cook's Human Resources Department about the continuing hostile, harassing, discriminatory and retaliatory treatment that he had experienced and was continuing to experience.

214.    On February 20, 2020, Cook's Executive Committee of the Board of Trustees notified Dr. Thomas that it had adopted the Joint Credentials Committee's recommendation of a "conditional reappointment" that he would receive a limited reappointment of 8 months if he agreed to certain conditions.

215.    None of the conditions detailed in Cook's February 20, 2020 letter written by is Executive Committee of the Board of Trustee to Dr. Thomas had ever been required of another physician at Cook in its totality.

216.    This February 20, 2020 letter was written and signed by Defendant Cychol who was the President of Cook Children's Medical Center where Dr. Thomas performed his duties as a pediatric surgeon.

217.    Defendant Cychol knew about Dr. Thomas' allegations of discrimination, retaliation and a hostile work environment before she issued that February 20, 2020 letter.

218.    Defendant Cychol acknowledged in her February 20, 2020 letter to Dr. Thomas that Dr. Thomas was "a tremendous asset to the patients served by Cook Children's Medical Center and its Professional Staff".

219.    That February 20th letter written and signed by Defendant Cychol conditioned his limited reappointment of 8 months through October 31, 2020.

220.    To receive this reappointment of 8 months, Dr. Thomas had to agree to the following conditions following:

> a.   Attend the University of Florida College of Medicine course "Program for Distressed Physicians' or Vanderbilt University Medical Center course "Program for Distressed Physicians or the CPEP course "Improving Inter-Professional Communication."
>
> b.   A bi-weekly meeting with the Director of Perioperative Services and one other nurse leader. Cook made clear to Dr. Thomas that he could not tape or record the meetings.
>
> c.   Coaching, to be received initially on a weekly basis, to "develop tools to use when interacting" with staff.
>
> d.   Monthly written assessments about Dr. Thomas to be reviewed by the Joint Credentials Committee or its designee.

221.    There were more conditions that Dr. Thomas had to agree to remain employed by Cook than what was identified in the preceding paragraph.

222.    Defendant Cychol's February 20, 2020 letter to Dr. Thomas continued that Cook

would determine whether Dr. Thomas was fit to continue working a Cook after eight months.

223.    Cook wrongly regarded Dr. Thomas a "impaired" even though he was not limited in his ability to work.

224.    At all relevant times, Dr. Thomas performed all "essential functions" required of a Senior Pediatric Surgeon.

225.    Defendants demonstrated that Dr. Thomas perceived impairment was not considered minor or transitory when they regard him as impaired because Defendants repeatedly limited Plaintiff's reappointment for over a year from September 19, 2019 through October 30, 2020.

226.    Dr. Thomas wrote, in part, to Defendant Cychol:

I am in receipt of your letter dated February 20, 2020, which has been described as a "conditional reappointment" where I must agree to terms and conditions that are punitive, discriminatory and retaliatory because I have challenged the ongoing racial and gender discrimination and retaliation for engaging in protected activity.  Your letter is filled with false and self-serving statements to justify this unlawful "conditional reappointment", and I will not accept it for the reasons I have expressed.  My response should be read in tandem with all previous correspondence, documentation and communication about these well-documented issues.

227.    However, Defendant Cychol's made clear in her February 20, 2019 letter that if Dr. Thomas did not "accept the reappointment subject to these conditions", he would be terminated 9 days later on February 29, 2020.

228.    But even if Dr. Thomas' had agreed to the terms of Cook's "conditional

reappointment", Cook did not guarantee that Dr. Thomas "conditional reappointment" would end.

229.    Also, if Dr. Thomas' had agreed to the terms of Cook's "conditional reappointment", Cook did not guarantee that Dr. Thomas would be receive a two-year reappointment without conditions that were different from his similarly situated peers.

230.    Cook unlawfully terminated Dr. Thomas on February 29, 2020.

231.    Cook's termination of Dr. Thomas resulted in Dr. Thomas losing his Professional Staff membership and clinical privileges.

232.    Cook failed to treat Dr. Thomas the same as his similarly situated peers with respect to the terms and conditions of his employment and his reappointment, and as a result caused severe and long-lasting damage to Dr. Thomas' career and professional reputation.


## FIRST CAUSE OF ACTION

**Racial Discrimination under 42 U.S.C.S. § 1981, et seq. Against All Defendants**

233.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 232 as if fully set forth herein.

234.    Section 1981(a) guarantees, among many things, "[a]all persons…the same right…to make and enforce contracts…as is enjoyed by white citizens."

235.    Plaintiff's claims of intentional discrimination pursuant to a contract under 42 U.S.C. §1981, et seq. ("Section 1981") are brought pursuant to the requirements and obligations of the statute.

236.    Each Defendant, including the corporate defendants ("Cook") and the individual defendants (Mr. Merrill, Ms. Cychol, Mr. Nelson, Mr. Reaves, and Mr. Beam), exercised control

and material influence over the terms, conditions and privileges of Plaintiff's employment, thereby making the individually-named defendants functionally the same as Plaintiff's employer.

237.    Each of the Defendants intentionally subjected Plaintiff to discrimination with respect to the terms, conditions and privileges of his employment on the basis of Plaintiff's African-American race.

238.    Defendants' discrimination was intentional, malicious and committed with reckless disregard for the natural and probable consequences of their unlawful actions, all of which lacked justification, and were designed to, and did in fact, cause Plaintiff specific, punitive and compensatory injury in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1981.

239.    "But for" Plaintiff's race, he would not have suffered Defendants' adverse employment action of being terminated.

240.    Defendants' racially discriminatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1981.

241.    Specifically, Defendants unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## SECOND CAUSE OF ACTION

**Hostile Work Environment under 42 U.S.C.S. § 1981, <u>et seq.</u> Against All Defendants**

242.    The plaintiff incorporates by reference the allegations in paragraph 1 through 241

as if fully set forth herein.

243.    Each of the corporate and individual Defendants intentionally subjected Plaintiff to unwelcomed harassment because of his race.

244.    "But for" Plaintiff's race, the corporate and individual Defendants would not have subjected Plaintiff to harassment and a hostile work environment.

245.    The harassment complained of affected the terms, conditions or privileges of Plaintiff's employment.

246.    Each of the Defendants knew or should have known of the harassment and failed to take prompt remedial action.

247.    The harassment created a work environment was both objectively and subjectively offensive that a reasonable person would have found hostile and abusive, as did Plaintiff.

248.    Defendants' racially-motivated acts of harassment caused specific, punitive and compensatory injuries in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1981.

249.    Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.


### THIRD CAUSE OF ACTION

**Retaliation under 42 U.S.C. § 1981, _et seq._ Against All Defendants**

250.    The plaintiff incorporates by reference the allegations in paragraphs 1 through

249 as if fully set forth herein.

251.    Plaintiff has made a *prima facie* showing that (1) Plaintiff engaged in protected activity when he opposed and complained about racial discrimination based on his race and informed management of his good faith belief about the discrimination; (2) Defendants were aware of such activity; and (3) there was a causal connection between the protected activity and the adverse action.

252.    Defendants' retaliatory actions were intentional, malicious, and committed with reckless disregard for the natural and probable consequences of their actions, that lacked any justification, but were designed to, and did cause, specific, punitive and compensatory injury in violation of the plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1981.

253.    Defendants' retaliatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1981.

254.    Specifically, Defendants unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## **FOURTH CAUSE OF ACTION**

**Racial Discrimination under Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII") Against the Corporate Defendants**

255.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 254 as if fully set forth herein.

256.    Defendant CCPN was, at all relevant times, Plaintiff's employer and an employer as defined by Title VII.

257.    Defendants CCMC and CCHCS were, at all relevant times, Plaintiff's employers and employers as defined by Title VII, and/or entities that used their position of power and control to interfere with Plaintiff's employment relationship with a third party, making them liable under Title VII under the *Sibley* doctrine.

258.    It was illegal under Title VII for Defendants CCPN, CCMC, and CCHCS to discriminate against Plaintiff because of his race.

259.    Plaintiff's race was a motivating factor in Defendants' decision to discharge Plaintiff and deny Plaintiff the enjoyment of the same terms, conditions, and privileges of employment that his similarly-situated peers enjoyed.

260.    Defendants CCPN, CCMC, and CCHCS violated Title VII by discriminating against Plaintiff based on his race and giving preferential treatment to white pediatric surgeons.

261.    Defendants' racially discriminatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Title VII.

262.    Specifically, Defendants unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## FIFTH CAUSE OF ACTION

### Intersectional Discrimination (Race Plus Sex) under Title VII Against the Corporate Defendants

263.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 262 as if fully set forth herein.

264.    It was illegal under Title VII for Defendants CCPN, CCMC, and CCHCS to

discriminate against Plaintiff because of his protected status as an African-American male.

265.    Plaintiff's protected status as an African-American male was a motivating factor in Defendants' decision to discharge Plaintiff and deny Plaintiff the enjoyment of the same terms, conditions, and privileges of employment that his similarly-situated peers enjoyed.

266.    Defendants CCPN, CCMC, and CCHCS violated Title VII by discriminating against Plaintiff based on his race and gender, and giving preferential treatment to pediatric surgeons who were not African-American males.

267.    Defendants' discriminatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Title VII.

268.    Specifically, Defendants unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.


## SIXTH CAUSE OF ACTION

### Hostile Work Environment under Title VII Against the Corporate Defendants

269.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 268 as if fully set forth herein.

270.    Each of the corporate Defendants intentionally subjected Plaintiff to unwelcomed harassment because of his race and/or because of his status as an African-American male.

271.    Plaintiff's race, and/or Plaintiff's status as an African-American male, was a motivating reason for Defendants' harassing and hostile treatment of Plaintiff.

272.    The harassment complained of affected the terms, conditions or privileges of

Plaintiff's employment.

273.    Each of the corporate Defendants knew or should have known of the harassment and failed to take prompt remedial action.

274.    The harassment created a work environment was both objectively and subjectively offensive such that a reasonable person would have found hostile and abusive, as did Plaintiff.

275.    Defendants' acts of harassment, which were racially motivated and/or motivated by Plaintiff's race and gender, caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Title VII.

276.    Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.


## SEVENTH CAUSE OF ACTION

### Retaliation under Title VII Against the Corporate Defendants

277.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 276 as if fully set forth herein.

278.    Plaintiff engaged in protected activity by submitting internal complaints of race and gender discrimination and harassment to Defendants.

279.    Each time Plaintiff submitted a complaint of race and/or gender discrimination to Defendants, Defendants escalated their retaliation against Plaintiff, subjecting Plaintiff to new and more harmful adverse actions.

280.    It was illegal under Title VII for Defendants CCPN, CCMC, and CCHCS to retaliate against Plaintiff for engaging in this type of protected activity.

281.    It was also illegal under Title VII for Defendants CCMC and CCHCS to use their position of power and control to interfere with the Plaintiff's employment relationship CCPN based on Plaintiff's protected activity.

282.    But for Plaintiff's protected activity, Defendants would not have decided to discharge Plaintiff and would not have denied Plaintiff the enjoyment of the same terms, conditions, and privileges of employment that Plaintiff had enjoyed prior to submitting his internal complaints of race, gender, and disability discrimination.

283.    Defendants CCPN, CCMC, and CCHCS violated Title VII by retaliating against Plaintiff because of his protected activity.

284.    Defendants' retaliatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Title VII and Chapter 21 of the Texas Labor Code.

285.    Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## EIGHTH CAUSE OF ACTION

### Disability Discrimination under the Americans with Disabilities Discrimination of 1990, 42 U.S.C. § 12102, et seq. Against the Corporate Defendants

286.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 285 as if fully set forth herein.

287.    A "disability" under the Americans with Disabilities Act is defined as a physical

or mental impairment that substantially limits one or more of the major life activities of an individual; a record of such impairment; or being regarded as have such an impairment.

288.    A "major life activity" includes one's ability to work. 29 C.F.R. § 1630.2.

289.    One is "substantially limited" in a major life activity if the individual is: (1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as the condition, manner, or duration by which the average person in the general population can perform that same major life activity.

290.    Plaintiff established in his pleadings that each of the corporate Defendants discriminated against him on the basis of a perceived disability when his employment contract was not renewed for a two-year reappointment.

291.    Plaintiff has pled facts establishing that (1) the corporate Defendants regarded him as disabled based on a perceived mental impairment, and subjected Plaintiff to actions prohibited by the ADA because of his perceived mental impairment; (2) Plaintiff was qualified for reappointment for the customary two years, (3) Plaintiff was subjected to an adverse employment decision on account of his perceived disability; and (4) Plaintiff was treated less favorably than his similarly-situated peers who were not regarded as disabled.

292.    Plaintiff also pled facts showing that Defendants perceived Plaintiff to have a mental disability that substantially limited Plaintiff's ability to work and that was not transitory or minor.

293.    Defendants' termination of Plaintiff is considered an adverse action under ADA regulations. 29 C.F.R. § 1630.2(1).

294.    Defendants' act of disability discrimination caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Americans with Disabilities Act.

295.     Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## NINTH CAUSE OF ACTION

**Retaliation under the Americans with Disabilities Act Against the Corporate Defendants**

296.     The plaintiff incorporates by reference the allegations in paragraphs 1 through 295 as if fully set forth herein.

297.     Plaintiff engaged in protected activity by submitting an internal complaints of disability discrimination to Defendants.

298.     Each time Plaintiff submitted a complaint of disability discrimination to Defendants, Defendants escalated their retaliation against Plaintiff, subjecting Plaintiff to new and more harmful adverse actions.

299.     It was illegal under the Americans with Disabilities Act for Defendants CCPN, CCMC, and CCHCS to retaliate against Plaintiff for engaging in this type of protected activity.

300.     It was also illegal under the Americans with Disabilities Act for Defendants CCMC and CCHCS to use their position of power and control to interfere with the Plaintiff's employment relationship CCPN based on Plaintiff's protected activity.

301.     But for Plaintiff's protected activity, Defendants would not have decided to discharge Plaintiff and would not have denied Plaintiff the enjoyment of the same terms, conditions, and privileges of employment that Plaintiff had enjoyed prior to submitting his internal complaints of disability discrimination.

302.    Defendants CCPN, CCMC, and CCHCS violated the Americans with Disabilities Act by retaliating against Plaintiff because of his protected activity.

303.    Defendants' retaliatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under the Americans with Disabilities Act.

304.    Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

**TENTH CAUSE OF ACTION**

**Racial Discrimination under Chapter 21 of the Texas Labor Code Against the Corporate Defendants**

305.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 304 as if fully set forth herein.

306.    Defendant CCPN was, at all relevant times, Plaintiff's employer and an employer as defined by Chapter 21 of the Texas Labor Code.

307.    Defendants CCMC and CCHCS were, at all relevant times, Plaintiff's employers and employers as defined by Chapter 21 of the Texas Labor Code, and/or entities that used their position of power and control to interfere with Plaintiff's employment relationship with a third party, making them liable under Chapter 21 of the Texas Labor Code under the *Sibley/Rennels* doctrine.

308.    It was illegal under Title VII and Chapter 21 of the Texas Labor Code for Defendants CCPN, CCMC, and CCHCS to discriminate against Plaintiff because of his race.

309.    It was also illegal under Chapter 21 of the Texas Labor Code for Defendants

CCPN, CMC, and CCHCS to "aid, abet, incite, or coerce" any other defendant named herein to discriminate against Plaintiff based on his race.

310.    Plaintiff's race was a motivating factor in Defendants' decision to discharge Plaintiff and deny Plaintiff the enjoyment of the same terms, conditions, and privileges of employment that his similarly-situated peers enjoyed.

311.    Defendants CCPN, CCMC, and CCHCS violated Texas Labor Code § 21.001 *et seq.,* by discriminating against Plaintiff based on his race and giving preferential treatment to white pediatric surgeons.

312.    Defendants' racially discriminatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Chapter 21 of the Texas Labor Code.

313.    Specifically, Defendants unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## ELEVENTH CAUSE OF ACTION

### Intersectional Discrimination (Race Plus Sex) under Chapter 21 of the Texas Labor Code Against the Corporate Defendants

314.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 313 as if fully set forth herein.

315.    It was illegal under Chapter 21 of the Texas Labor Code for Defendants CCPN, CCMC, and CCHCS to discriminate against Plaintiff because of his protected status as an African-American male.

316.    It was also illegal under Chapter 21 of the Texas Labor Code for Defendants CCPN, CMC, and CCHCS to "aid, abet, incite, or coerce" any other defendant named herein to discriminate against Plaintiff based on his protected status as an African-American male.

317.    Plaintiff's protected status as an African-American male was a motivating factor in Defendants' decision to discharge Plaintiff and deny Plaintiff the enjoyment of the same terms, conditions, and privileges of employment that his similarly-situated peers enjoyed.

318.    Defendants CCPN, CCMC, and CCHCS violated Texas Labor Code § 21.001 *et seq.,* by discriminating against Plaintiff based on his race and gender, and giving preferential treatment to pediatric surgeons who were not African-American males.

319.    Defendants' discriminatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Chapter 21 of the Texas Labor Code.

320.    Specifically, Defendants unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## TWELFTH CAUSE OF ACTION

### Hostile Work Environment under Chapter 21 of the Texas Labor Code Against the Corporate Defendants

321.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 320 as if fully set forth herein.

322.    Each of the corporate Defendants intentionally subjected Plaintiff to unwelcomed harassment because of his race and/or because of his status as an African-American male.

323.    Plaintiff's race, and/or Plaintiff's status as an African-American male, was a motivating reason for Defendants' harassing and hostile treatment of Plaintiff.

324.    The harassment complained of affected the terms, conditions or privileges of Plaintiff's employment.

325.    Each of the corporate Defendants knew or should have known of the harassment and failed to take prompt remedial action.

326.    The harassment created a work environment was both objectively and subjectively offensive such that a reasonable person would have found hostile and abusive, as did Plaintiff.

327.    Defendants' acts of harassment, which were racially motivated and/or motivated by Plaintiff's race and gender, caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Chapter 21 of the Texas Labor Code.

328.    Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

**THIRTEENTH CAUSE OF ACTION**

**Retaliation under Chapter 21 of the Texas Labor Code Against the Corporate Defendants**

329.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 328 as if fully set forth herein.

330.    Plaintiff engaged in protected activity by submitting an internal complaints of race discrimination, gender discrimination, and disability discrimination to Defendants.

331.    Each time Plaintiff submitted a complaint of race, gender, and/or disability discrimination to Defendants, Defendants escalated their retaliation against Plaintiff, subjecting Plaintiff to new and more harmful adverse actions.

332.    It was illegal under Chapter 21 of the Texas Labor Code for Defendants CCPN, CCMC, and CCHCS to retaliate against Plaintiff for engaging in protected activity.

333.    It was also illegal under Chapter 21 of the Texas Labor Code for Defendants CCPN, CMC, and CCHCS to "aid, abet, incite, or coerce" any other defendant named herein to retaliate against Plaintiff based on his protected activity.

334.    It was also illegal under Chapter 21 of the Texas Labor Code for Defendants CCMC and CCHCS to use their position of power and control to interfere with the Plaintiff's employment relationship CCPN based on Plaintiff's protected activity.

335.    But for Plaintiff's protected activity, Defendants would not have decided to discharge Plaintiff and would not have denied Plaintiff the enjoyment of the same terms, conditions, and privileges of employment that Plaintiff had enjoyed prior to submitting his internal complaints of race, gender, and disability discrimination.

336.    Defendants CCPN, CCMC, and CCHCS violated Texas Labor Code § 21.001 *et seq.,* by retaliating against Plaintiff because of his protected activity.

337.    Defendants' retaliatory actions caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Chapter 21 of the Texas Labor Code.

338.    Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## FOURTEENTH CAUSE OF ACTION

**Retaliatory Hostile Work Environment under Chapter 21 of the Texas Labor Code Against the Corporate Defendants**

339.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 338 as if fully set forth herein.

340.    Each of the corporate Defendants intentionally subjected Plaintiff to unwelcomed harassment because of Plaintiff's protected activity.

341.    But for Plaintiff's protected activity, Defendants would not have harassed Plaintiff and subjected Plaintiff to a hostile work environment.

342.    The harassment complained of affected the terms, conditions or privileges of Plaintiff's employment.

343.    Each of the corporate Defendants knew or should have known of the harassment and failed to take prompt remedial action.

344.    The harassment created a work environment was both objectively and subjectively offensive such that a reasonable person would have found hostile and abusive, as did Plaintiff.

345.    Defendants' retaliatory acts of harassment caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Chapter 21 of the Texas Labor Code.

346.    Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## FIFTEENTH CAUSE OF ACTION

**Disability Discrimination under Chapter 21 of the Texas Labor Code Against the Corporate Defendants**

347.    The plaintiff incorporates by reference the allegations in paragraphs 1 through 346 as if fully set forth herein.

348.    A "disability" under Chapter 21 of the Texas Labor Code is defined as a physical or mental impairment that substantially limits one or more of the major life activities of an individual; a record of such impairment; or being regarded as have such an impairment.

349.    A "major life activity" includes one's ability to work.

350.    One is "substantially limited" in a major life activity if the individual is: (1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as the condition, manner, or duration by which the average person in the general population can perform that same major life activity.

351.    Plaintiff established in his pleadings that each of the corporate Defendants discriminated against him on the basis of a perceived disability when his employment contract was not renewed for a two-year reappointment.

352.    Plaintiff has pled facts establishing that (1) the corporate Defendants regarded him as disabled based on a perceived mental impairment, and subjected Plaintiff to actions prohibited by Chapter 21 of the Texas Labor Code because of his perceived mental impairment; (2) Plaintiff was qualified for reappointment for the customary two years, (3) Plaintiff was subjected to an adverse employment decision on account of his perceived disability; and (4) Plaintiff was treated less favorably than his similarly-situated peers who were not regarded as disabled.

353.    Plaintiff also pled facts showing that Defendants perceived Plaintiff to have a mental disability that substantially limited Plaintiff's ability to work and that was not transitory or minor.

354.    Defendants' termination of Plaintiff is considered an adverse action under Chapter 21 of the Texas Labor Code.

355.    Defendants' act of disability discrimination caused specific, punitive and compensatory injuries in violation of Plaintiff's rights under Chapter 21 of the Texas Labor Code.

356.    Specifically, Defendants' unlawful actions caused Plaintiff harm to his career, his future employment prospects and his professional reputation, the loss of wages and income, the loss of insurance and fringe benefits, other related and incidental losses, and the expense of court costs and attorney fees in seeking to protect and enforce his rights.

## JURY DEMAND

357.    Plaintiff, Dr. Patrick Thomas, demands a trial by jury on each and every one of his claims as pled herein pursuant to Federal Rules of Civil Procedure 38.

**WHEREFORE,** Plaintiff demands judgment against each of the Defendants as follows:

1.    An Order finding each of the corporate and individual Defendants jointly and severally liable for damages awarded to Plaintiff under Section 1981.

2.    An Order finding the corporate Defendants jointly and severally liable for any damages awarded to Plaintiff under Title VII, the ADA, and/or Chapter 21 of the Texas Labor Code.

3.     An award to the plaintiff of his actual damages in an amount to be determined at trial for loss of wages, benefits and promotional opportunities, including an award of front and back pay, compensating plaintiff for the loss of past and future salary and benefits;

4.     An award of punitive damages and/or exemplary damages;

5.     An award of compensatory damages;

6.     Pre-judgment and post-judgment interest on all amount awarded to Plaintiff to the full extent permitted by law;

7.     An award of costs and reasonable attorneys' fees to the full extent permitted by law;

8.     A declaration that Defendants' actions violated federal and state anti-discrimination and retaliation laws;

9.     An Order prohibiting Defendants from continuing or maintaining the policy and/or custom of discriminating and retaliating against African-Americans and/or African-American males with respect to reappointments and engaging in protected activity and opposition activity; and

10.     Such other and further relief as this Court may deem just and proper.


Date: November 25, 2020                   Respectfully submitted,

**TREMAIN ARTAZA PLLC**

/s/ *Christine A. Hopkins*
Christine A. Hopkins
Texas State Bar No. 24095768
christine@tremainartaza.com
13140 Coit Rd., Ste 104
Dallas, TX 75240

*Plaintiff's Original Complaint and Jury Demand*            53

Direct: (469) 573-0297
Fax: (214) 254-4941

**ATTORNEYS FOR PLAINTIFF**


**STACEY GRAY PC**
By:  Stacey M. Gray

*/s/ Stacey M. Gray*
sgray@staceygray.com
Stacey M. Gray, Esq.
60 East 42nd Street, Suite 4600
New York, NY 10165
Phone: (212) 227-9163
Fax: (212) 227-8845

**ATTORNEY FOR PLAINTIFF, PRO
HAC VICE APPLICATION PENDING
WITH THE COURT**