IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| PATRICK THOMAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:20-cv-01272-O |
| | § | |
| COOK CHILDREN'S HEALTH CARE | § | |
| SYSTEM, et al., | § | |
| | § | |
| Defendants. | § | |
| | § | |

## MEMORANDUM OPINION & ORDER

Before the Court are Defendant Cook Children's ("Cook") Motion for Summary Judgment (ECF No. 59), filed December 15, 2021; Brief in Support (ECF No. 80), substituted per the Court's order on January 20, 2022; and Joint Appendix (ECF No. 83), filed under seal on January 16. Rick Merrill, Nancy Cychol, Dr. W. Britt Nelson, Dr. Larry Reaves, and Dr. Donald Beam ("Individual Defendants") filed a separate Motion for Summary Judgment (ECF No. 58) on December 15, 2021, and Brief in Support (ECF No. 81), substituted per the Court's order on January 20, 2022.

Plaintiff Patrick Thomas filed Responses (ECF Nos. 69, 71) on January 5, Briefs in Support (ECF Nos. 84, 86) on January 24, and an Appendix in Support (ECF No. 85) on January 24. Defendants' sealed Replies (ECF Nos. 87, 88) were also docketed on January 24.

Thomas filed an Unopposed Motion for Leave to File Supplemental Evidence in Support of Responses (ECF Nos. 96, 97) on February 7, explaining that he had "left out parts of the transcript that are important for the Court to review to fairly and fully assess Defendants' assertions." Mot. 1, ECF No. 96. Because the Motion is unopposed, the Court **GRANTS** it and

1

**DIRECTS** the Clerk to file under seal the exhibits attached to the Motion. The Court previously granted Defendants' Motion to File Supplemental Evidence (ECF No. 92), which was likewise filed under seal.

Having considered the motions, briefing, and applicable law, the Court **GRANTS** each of Defendants' Motions for Summary Judgment (ECF Nos. 58, 59).

## I.      BACKGROUND

### A.  Overview

Dr. Patrick Thomas worked as a pediatric surgeon at Cook Children's for approximately twelve years. During his tenure, Thomas was the only black member of the Pediatric Surgery Group,[1] although Cook employed other black pediatric surgeons in other departments.[2] By all accounts, Thomas was a talented surgeon and valued member of the team.[3]

The relationship between Thomas and his employer soured when Thomas began receiving "unprecedented" numbers of complaints and event reports related to his treatment of the nursing staff.[4] Cook's leadership temporarily reduced the length of Thomas's contracts and required him to improve his behavior through remedial meetings and coaching. This plan worked temporarily. But when Thomas's problematic behavior returned—and worsened—a few years later, he refused to sign his contract renewal subject to the performance improvement plan that had proven effective previously. His contract term ended, and he brought this suit against Cook.

---

[1] Pl.'s Resp. 15–16, ECF No. 84.
[2] Beyond than the "catch-all" Pediatric Surgery Group, the cardiothoracic, ophthalmology, and orthopedics departments employed black pediatric surgeons. Cook Br. 17 n.3, ECF No. 80.
[3] Pl.'s App. 535, ECF No. 85-1.
[4] Defs.' App. 6, ECF No. 83.

### B.  Event Reports Between 2008 and 2013

In 2008, Thomas joined Cook Children's Physician Network's ("CCPN") Pediatric Surgery Group on a one-year contract basis.[5] During that year, the Peer Assistance Committee ("PAC")[6] received "numerous complaints" about Thomas's interactions with nurses and techs.[7] He reportedly lashed out, raised his voice, challenged their competency, and made demeaning remarks.[8] At least one nurse expressed that she was "less likely to call [Thomas] in the future based on some interactional friction that transpired."[9] Even Thomas's own contemporaneous records highlight his unprofessional interactions with the nursing staff.[10] In a 2009 email to the chair of the PAC, Thomas described a miscommunication with a floor nurse. When Thomas's patient and her family arrived for a scheduled admission, the nurse paged Thomas to ask for orders, because she "did not know why the patient was on the floor."[11] Thomas said, "I asked [the nurse] if she knew how to read the last note in meditech if she wanted some education on 'why the patient was here.'"[12]

In 2009, the Credentials Committee reviewed Thomas's reappointment.[13] Due to the complaints, the Committee "thought it would be appropriate to reappoint [Thomas] for two years with a strong reminder that professional courtesy and cooperation with all staff is expected."[14]

---

[5] Cook Br. 17, ECF No. 80.
[6] The Peer Assistance Committee is a physician-led group "designed to help physicians with issues that impact a doctor's ability to work." Cook Br. 12, ECF No. 80. The PAC addresses "disruptive behavior, cognitive impairment, substance abuse, depression, burnout" and other issues. *Id.* When the Credentials Committee identifies concerning behaviors, it refers the case to the PAC, which can investigate and make recommendations to the Credentials Committee. *Id.* at 12–17. The Credentials Committee then takes over and typically chooses to renew credentials—sometimes contingent on an improvement plan. *Id.* at 16.
[7] Defs.' App. 34, ECF No. 83.
[8] *Id.*; Cook Br. 17, ECF No. 80.
[9] Defs.' App. 141, ECF No. 83.
[10] *See* Pl.'s App. 325, ECF No. 85.
[11] *Id.*
[12] *Id.*
[13] Cook Br. 17, ECF No. 80.
[14] Defs.' App. 163, ECF No. 83.

Despite this warning, Thomas's behavioral issues continued. According to the PAC's review of reports filed in 2010 and 2011, Thomas continued to be "abrupt and rude" to staff,[15] responding to nurses in a "demeaning manner."[16] The PAC found that these episodes represented a pattern and called for a meeting with Thomas.[17] This meeting resulted in no disciplinary action,[18] but at Thomas's next reappointment review, the Committee recommended a shortened contract period of one year.[19] At the end of the one-year period, in late 2012, the Credentials Committee recommended a 90-day reappointment to allow time to investigate two additional event reports that had arisen in the previous one-year period.[20] Thomas maintains that each of these event reports was "false, uninvestigated and unsubstantiated."[21]

### C.  Behavioral Improvements Between 2014 and 2017

During this time, the PAC recommended that Thomas meet with an outside psychologist, Dr. Mellina, for mental health screening and counselling.[22] Thomas cooperated with the PAC and agreed to work with Dr. Mellina, who reported that Thomas would be "working to develop the tools he needs to interact with others more consistently in a constructive fashion of which . . . he is quite capable."[23]

For a time, Thomas's work with Dr. Mellina appeared to be a complete success.[24] Dr. Mellina noted that Thomas had begun "to manage his mood, most particularly frustration, in a

---

[15] *Id.* at 143.
[16] *Id.* at 145.
[17] *Id.*
[18] *Id.* at 144.
[19] *Id.* at 149.
[20] *Id.* at 150.
[21] Pl.'s Resp. 17, ECF No. 84; *see infra* Section I.E.
[22] Defs.' App. 150, 167, ECF No. 83.
[23] *Id.* at 158.
[24] *Id.* at 159.

much healthier and constructive way."[25] His interactions with staff improved "dramatically."[26] In March 2014, the Credentials Committee renewed Thomas's credentials for the remainder of the standard two-year cycle set to end in September 2015.[27] Complaints about Thomas's behavior essentially stopped.[28] Defendants characterized this night-and-day improvement as "one of the PAC's great success stories."[29] Over the next few years, Defendants placed Thomas in a number of leadership roles: member of the mentoring committee, assistant medical director, and "super-user" and trainer when the hospital underwent a system-wide software overhaul.[30]

### D. Event Reports Between 2017 and 2020

But Thomas's behavior suddenly took a turn for the worse in late 2017.[31] Within nine months, Defendants received twelve new event reports alleging misconduct.[32] And in less than two years, Thomas accumulated nineteen event reports and two complaints.[33]

Some reports are particularly shocking. In a 2019 incident, Thomas received two FaceTime calls from his daughter during surgery. The first time, Thomas instructed a circulating nurse to answer the call for him while he was scrubbing in. He told his daughter, "Daddy is doing surgery right now, I love you, I will call you back."[34] When his daughter FaceTimed him a second time, Thomas proceeded to have a conversation with her while his hands were on the instruments.[35] Thomas instructed the circulating nurse to scan his phone across the operating room so that his

---

[25] *Id.*

[26] *Id.* at 42.

[27] *Id.* at 160.

[28] *Id.* at 36.

[29] Cook Br. 19, ECF No. 80.

[30] Defs. App. 42–43, 100, 1079, ECF No. 83.

[31] The Credentials Committee had reappointed Thomas for regular two-year intervals in 2015 and 2017. Cook Br. 19, ECF No. 80.

[32] Defs.' App. 224–233, ECF No. 83.

[33] *Id.*

[34] Event ID 00167311, Defs.' App. 248, ECF No. 83.

[35] *Id.*

daughter could "wave to everyone."[36] During each call, his daughter was "able to view . . . the surgical field," placing the patient's privacy at risk.[37]

Many reports describe Thomas directing anger, sarcasm, or the "silent treatment" toward the nursing staff. For example, when the imaging software system responded too slowly, Thomas "snapp[ed]" at a nurse: "Are the screens frozen, do you not know what you're doing?"[38] When asked to give a verbal order for a line placement, Thomas "completely shut down and stopped answering all questions coming from the staff."[39] Some staff felt as though Thomas's comments towards them were "confrontational,"[40] "derogatory,"[41] "bullying,"[42] and "condescending."[43]

Other reports expressed concerns about procedure, timeliness, and patient safety. On multiple occasions, Thomas failed to place orders promptly and to respond to staff when paged.[44] In response to a nurse trying to follow hospital procedure, Thomas pressured her to take shortcuts: "You don't need an order or any paperwork, this is an indicated procedure, you just need to get this done."[45] During one lunchtime staff change, Thomas reportedly insisted that the surgical staff not count the sharps, sponges, and instruments, even though staff had recently been reminded of the "count policy" which required counting whenever there was a staff change in the operating room.[46]

---

[36] *Id.*
[37] *Id.*
[38] Event ID 00170151, *id.* at 249.
[39] *Id.*
[40] *Id.*
[41] Event ID 00169450, *id.* at 248.
[42] Event ID 00160365, *id.* at 243.
[43] Event ID 00170151, *id.* at 249.
[44] Event ID 00164054, *id.* at 247; Event ID 00160784, *id.* at 245; Event ID 00161087, *id.* at 245; Event ID 00161324, *id.* at 245.
[45] Event ID 00170151, *id.* at 249.
[46] Event ID 00165670, *id.* at 247.

In the span of twelve years, Thomas had accumulated approximately fifty event reports and complaints—an extraordinarily high number in comparison to his peers.[47] The typical Cook physician receives zero event reports in a review period.[48] Receiving one to two reports is "unusual," and a physician with three to five is an "outlier."[49] To accumulate nineteen reports and two complaints in a single period is "totally unprecedented."[50]

### E.  Investigation and Rebuttal of Event Reports

Believing the event reports were part of a coordinated effort to racially target him, Thomas disputed their legitimacy and contested the facts.[51] In some instances, Thomas emailed members of the PAC soon after the incident to provide his side of the story. In others, he retroactively denied the event reports' allegations as this litigation unfolded. But these factual disputes are not material to the analysis, because even after excluding reports that do not raise legitimate concerns about Thomas's behavior, dozens of event reports remain. Collectively, the reports indicate a "pattern" of worrisome behavior.[52]

The fifty event reports and complaints fall into roughly three categories. First, a small percentage of the reports were resolved in Thomas's favor after PAC investigation. These were ultimately removed from Thomas's file and were not considered in the reappointment process. Reports in the second category were resolved neither for nor against Thomas. In this middle ground, the PAC found that although Thomas may not have been responsible for the

---

[47] *See id.* at 6.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.* at 260; Pl.'s App. 699, ECF No. 85; Pl.'s Resp. 30, ECF No. 84. While Thomas complains he did not receive certain event reports, the chair of the PAC notes that "[t]raditionally, [Cook] and the Peer Assistance Committee do not provide copies of Event Reports to physicians" in order to protect the identity of the individual who filed the report. Defs.' App. 4, ECF No. 83. The PAC made a rare exception by providing redacted copies to Thomas. *Id.*
[52] *See, e.g.*, Defs.' App. 141, 145, ECF No. 83.

circumstances, he reacted inappropriately towards staff. The third and final category of reports are those Thomas did not rebut or flatly denied without supporting evidence.

*First*, Defendants resolved and dismissed select event reports after Thomas rebutted them. Thomas makes much of a "Code Gray" 2013 event report, which involved severe weather protocol in the operating room. Thomas alleged that this particular event report adversely affected the terms and conditions of Thomas's subsequent reappointment.[53] However, when the PAC investigated the matter in 2013, it concluded that the incident was a result of a "process problem" and Thomas was not at fault.[54] The PAC then recommended that the event report be removed from Thomas's file, "since it was determined the event report was not a true reflection of what actually happened."[55] Similarly, in a 2014 event report, a nurse was discussing concerns about a patient's wound suction levels.[56] Thomas allegedly responded that she should apply the "baseline knowledge [she] gained in nursing school."[57] The nurse took offense and complained about the interaction, but the PAC investigated and dismissed the conversation as a "non-issue."[58] These report did not factor into Thomas's subsequent reappointments, and he received regular two-year cycles in 2015 and 2017.[59]

*Second*, several event reports fall in a middle ground. Here, the PAC investigated, determined Thomas was not at fault for the underlying situation, but admonished him for his tone, communication, or reaction to the problem at hand. For example, in the 2009 incident involving the floor admission miscommunication, the PAC carefully considered both the event report and Thomas's version of events, concluding "there is always a 'he said / she said' angle and that the

---

[53] *Id.* at 389.
[54] Pl.'s App. 459, ECF No. 85-1.
[55] *Id.*
[56] *Id.* at 323.
[57] *Id.*
[58] *Id.*
[59] Cook Br. 19, ECF No. 80.

8

absolute truth probably lies somewhere in the middle with some faults coming from both sides."[60] The PAC warned Thomas against using "demeaning or unnecessarily assertive tones" with staff.[61]

In a 2010 incident involving an infant's death certificate and transfer, Thomas was allegedly "abrupt and rude to the staff" who were trying to accomplish the transfer.[62] Thomas offered a conclusory rebuttal, with no evidence in support of his version of events: "I did not raise my voice or not cooperate with getting a death certificate signed."[63] The PAC investigation found that while Thomas "was trying to do the right thing in facilitating the transfer," he should have been "courteous and respectful of the staff and patient at all times."[64]

Several more reports in this second category remained under "PAC monitoring," "track-and-trend," and the "repeat offender" list.[65]

*Third*, the final category includes dozens of event reports that (1) remain unrebutted, or (2) Thomas denies with conclusory remarks and no substantive evidence. For example, in a 2016 event report, Thomas allegedly returned an instrument to an operating room staff member by throwing it on her instrument tray.[66] When the staff member expressed her concern about a sharp object potentially bouncing off the tray, Thomas asked her to scrub out and leave.[67] In response to the event report, Thomas's statement—in its entirety—reads: "The allegations in event report #00067997 are not true and not credible."[68]

Likewise, in a 2018 event report describing Thomas's "unprofessional and disrespectful" joke about the operating room staff, Thomas simply denied the allegation without offering

---

[60] Defs.' App. 141, ECF No. 83.
[61] *Id.*
[62] *Id.* at 143.
[63] Pl.'s App. 276, ECF No. 85.
[64] Defs.' App. 143, ECF No. 83.
[65] *See* Pl.'s App. 320–23, ECF No. 85.
[66] *Id.* at 323.
[67] *Id.*
[68] Event ID 00067997, *id.* at 279.

anything more: "The allegations are untrue, I did not tell or insinuate [the joke]."[69] In response to at least ten other event reports, Thomas makes similar denials (e.g., "I . . . did not engage in any disruptive behavior or blame nurses as alleged in event report #00028898.").[70]

Thomas believes that by contesting the event reports' validity, he has raised a genuine dispute of material fact. This is not the case. While Thomas focused exclusively on the individual events, the leadership at Cook repeatedly expressed concern about the persistent issue the event reports themselves represented—the "strained and ineffective" "dynamic between [Thomas] and the non-physician members of the health care team."[71] The PAC's "concern was the broader issue of why so many such reports come [Thomas's] way," and the "defensive posturing" with which Thomas received feedback.[72]

Belying Thomas's allegation of racial animus and "conspiracy"[73] are the reports' volume, pattern, and variety of sources and time periods. Moreover, if Thomas's history of event reports were motivated by racial animus, he has provided no explanation as to why other black pediatric surgeons outside the Pediatric Surgery Group did not receive event reports and complaints to nearly the same extent that Thomas did.

While Thomas's physician peers had "nothing but positive interactions with" him,[74] members of the non-physician staff felt "dread" when assigned to one of Thomas's rooms.[75] The reports spanned nearly twelve years and came from personnel across different hospital units.[76] Moreover, complaints from patients' families independently corroborate the concerns of the staff.

---

[69] Event ID 00162870, *id.* at 273.
[70] *See* Event ID 00028898, *id.* at 277.
[71] Defs.' App. 261, ECF No. 83.
[72] *Id.* at 263–64.
[73] *Id.* at 4.
[74] *Id.* at 264.
[75] Pl.'s App. 775, ECF No. 85-2.
[76] *See* Defs.' App. 227–33, ECF No. 83.

In one report, a patient's mother complained that Thomas was "rude," telling her to "get out of the room and go to the nurse station" because he was "done talking with her."[77]

### F.  Allegations of Discrimination

In September 2018, Thomas first complained to Cook Human Resources that he was being discriminated against based on his race.[78] Thomas identified three allegedly discriminatory events: (1) an incident soon after he began working at Cook, when a parking lot security guard attempted to question him, (2) another incident with a security guard preventing him from accessing a breakroom for a cup of coffee, and (3) ongoing difficulties finding staff to work in his operating room.[79] Director of Employee Relations, Valerie Warren, investigated each incident and concluded that (1) the parking lot incident had happened more than ten years prior and could not be investigated; (2) the breakroom in question was not for physician use; and (3) due to shortages, *all* physicians were having difficulty finding staff.[80] Warren found that Thomas, in particular, struggled to attract and retain a team because staff members felt he was "unpleasant to work with" due to his anger and poor attitude.[81]

### G.  Thomas's Departure

Between September 2018 and early 2020, Thomas continued to accumulate event reports at a rapid pace. On February 20, 2020, the Credentials Committee recommended that Thomas's credentials be renewed for eight months, subject to the following terms: Thomas would be required to attend (1) biweekly meetings with the director of perioperative services, Valerie Gibbs, (2) sessions with an external counselor or coach of Thomas's choice, and (3) a seminar for "distressed

---

[77] *Id.* at 250.
[78] Pl.'s Resp. 26–27, ECF No. 84 (citing Pl.'s App. 181, ECF No. 85).
[79] Defs.' App. 85, ECF No. 83.
[80] *Id.* at 85–86.
[81] *Id.* at 86.

physicians."[82] Defendants detailed these conditions in a letter to Thomas, clarifying that he would not be subject to "any restriction or limitation on [his] exercise of clinical privileges."[83]

Thomas refused to sign the renewal.[84] His credentials expired at midnight on March 1, 2020, and thus, his employment at Cook came to an end.[85]

### H.  Procedural Background

About nine months after his departure from Cook, Thomas filed suit against Defendants.[86] He initially brought fifteen claims, including hostile work environment, retaliation, intersectional (race plus sex) discrimination, disability discrimination under the Americans with Disabilities Act, and race discrimination under Title VII, Section 1981, and the Texas Labor Code.[87] Cook Children's and Individual Defendants jointly moved to dismiss for failure to state a claim.[88] This Court granted the motion only as to the disability and hostile work environment claims.[89] Now, Defendants seek summary judgment on the remaining claims, namely race discrimination, intersectional (race plus sex) discrimination, and retaliation.[90] Both of Defendants' motions for summary judgment are now ripe for the Court's review.

### II.  LEGAL STANDARDS

Summary judgment is appropriate only where the pleadings and evidence show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not "a disfavored procedural shortcut, but

---

[82] The cost of all coaching, counseling, seminars, and related travel would be covered by Defendants. *Id.* at 331.
[83] *Id.* at 332.
[84] *Id.* at 25.
[85] Cook Br. 24, ECF No. 80.
[86] *See* Compl., ECF No. 1. Thomas sued the three corporate entities (as joint employers), plus several Cook executives in their individual and official capacities. Pl.'s Resp. 38–41, ECF No. 84.
[87] *See* Compl. 35–52, ECF No. 1.
[88] ECF No. 13.
[89] ECF No. 21.
[90] ECF Nos. 58, 59.

rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material." *Id.* The movant must inform the court of the basis for its motion and identify the portions of the record that reveal there are no genuine disputes of material fact. *Celotex*, 477 U.S. at 323.

The court must view the evidence in the light most favorable to the nonmovant. *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013). "Moreover, a court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." *Id.* And if there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion for summary judgment. *Anderson*, 477 U.S. at 250.

The opposing party must "identify specific evidence in the record and . . . articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Therefore, where the opposing party fails to respond to a motion for summary judgment, the court may "accept[] as undisputed the facts so listed in support of [the] motion." *Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988). The court may grant the motion if the materials submitted make a prima facie showing that the moving party is entitled to judgment. *Id.*

### III.   ANALYSIS

#### A. Discrimination Claims

Thomas asserts race discrimination claims against Cook and the Individual Defendants under Title VII, Section 1981, and the Texas Commission on Human Rights Act ("TCHRA" or

the "Texas Labor Code"). Because the elements for discrimination under Title VII and Section 1981 are identical, the same analysis applies to claims under both laws. *Pratt v. City of Hous.*, 247 F.3d 601, 606 n.1 (5th Cir. 2001). The Texas Labor Code follows the same rule. *Goudeau v. Nat'l Oilwell Varco, LP*, 793 F.3d 470, 474 (5th Cir. 2015). Thomas's claims rely on circumstantial evidence of discrimination, so the Court applies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). The plaintiff bears the initial burden to establish a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's actions. *Id.* "If the employer sustains its burden, the prima facie case is dissolved, and the burden shifts back to the plaintiff." *Alvarado*, 492 F.3d at 611. The plaintiff must then show either that the employer's proffered reason is merely a pretext for discrimination, or that the plaintiff's protected characteristic was at least a "motivating factor" for the employer's actions. *Id.*

### 1.  Prima Facie Case

For the following reasons, Thomas has not established a prima facie case of discrimination. To establish a prima facie case of discrimination, Thomas must show that (1) he is a member of a protected class; (2) he was qualified for the position at issue; (3) he suffered an adverse employment action; and (4) others similarly situated but outside the protected class were treated more favorably. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007). The Court finds that Thomas has presented evidence to carry his burden as to elements one and two, but he cannot satisfy elements three and four. Defendants do not dispute that Thomas, as a black man, is a member of a protected class.[91] Nor do Defendants argue Thomas was not qualified for his role

---

[91] Cook's Br. 26, ECF No. 80; Pl.'s Br. 43, ECF No. 84.

as a pediatric surgeon.[92] The parties dispute (a) whether Thomas suffered an adverse employment action, and (b) whether comparable employees were treated more favorably. Thomas has failed to show he suffered an adverse employment action, and even if he had successfully done so, the Court finds no evidence that Defendants treated comparable employees more favorably.

### a.   Adverse Employment Action

"Under Title VII principles, which inform our treatment of [S]ection 1981 claims, an employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (citation omitted). Generally, "adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *McCoy*, 492 F.3d at 559 (cleaned up). Voluntary resignation is not an adverse employment action unless the employee can prove he was constructively discharged. Constructive discharge occurs when working conditions have become "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 480 (5th Cir. 2008). To determine whether an employee has been constructively discharged, courts look for factors like (1) demotion, (2) pay reduction, (3) reduction in job responsibilities, (4) reassignment to menial work, (5) reassignment to a younger supervisor, (6) badgering, harassment, or humiliation, and (7) early retirement offer on unfavorable terms. *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994).

---

[92] Thomas had the requisite skillset for the role. Pl.'s App. 267, ECF No. 85. Defendants describe Thomas as "a tremendous asset." Defs.' App. 330, ECF No. 83. When the Credentials Committee reviewed Thomas's application, the complaints about his behavior were alarming, but "he was otherwise qualified." Cook's Br. 20, ECF No. 80. And as Defendant Beam remarked in his deposition, "I think we would agree that he's a very good surgeon." Pl.'s App. 535, ECF No. 85-1.

### 1. Constructive Discharge

Defendants argue Thomas voluntarily resigned from his position by not agreeing to the reasonable "performance monitoring conditions" included in the February 2020 reappointment offer.[93] Thomas contends he suffered constructive discharge, because "no reasonable physician in a similar situation would have accepted the terms and conditions" offered as part of his reappointment.[94]

Thomas has not presented evidence that the offer's conditions were discriminatory or retaliatory. In exchange for the eight-month renewal, the offer required Thomas to participate regular check-ins with Gibbs, outside coaching or counseling sessions, and a one-time seminar.[95] Defendants did not restrict his privileges in any way. Yet Thomas argues that he was constructively discharged—in other words, these measures were so intolerable that no reasonable physician in his circumstances would tolerate them.[96] This cannot be true for four reasons.

*First*, placing an employee on a performance improvement plan is not an adverse action. *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 824 (5th Cir. 2019). In other words, a reasonable physician in Thomas's situation would have agreed to a such a plan as part of the reappointment process. In fact, Cook Children's physicians have routinely engaged in counseling and performance monitoring at the recommendation of the PAC.[97] Thomas's peers at Cook have

---

[93] Cook Br. 32, ECF No. 80.
[94] Pl.'s Br. 44, ECF No. 84.
[95] Defs.' App. 331, ECF No. 83.
[96] Pl.'s Resp. 44, ECF No. 84.
[97] Defendants provide three recent examples of physicians who cooperated with the Peer Assistance Committee's recommendations for performance improvement:

> In May 2019, a Middle Eastern female physician with five Event Reports and several patient complaints deemed minor, had her credentials renewed for only six months to allow her to attend psychological counseling and coaching. In October of 2019, she was renewed for another 6 months to monitor her compliance with the Peer Assistance Committee plan. In April of 2020, having actively cooperated with the Peer Assistance Committee, attended counseling, and showing improvement, her credentials were renewed for a year to keep monitoring. And, in April of 2021, having shown great improvement, was renewed for two years.

undergone (1) psychological counseling and coaching, (2) meetings with a nurse coordinator, and (3) ongoing performance monitoring.[98] Two physicians, each of whom had accumulated a handful of event reports, successfully completed their Committee-recommended plans and were reappointed for increasing periods of time—initially for six months, then one year, and finally, the standard two-year renewal. To argue no reasonable physician would tolerate such conditions is simply inconsistent with the facts.

*Second*, refusing to accept a reasonable corrective action plan, and losing one's employment as a result, is not constructive discharge. In an analogous case, a pediatric anesthesiologist received several complaints. As a condition of reappointment, the anesthesiologist's employer required her to take corrective action, including meeting with an advisor and completing a "program to assess her ability to practice with skill and safety." *Khalil v. Memorial Herman Health Sys.*, No. H-17-1954, 2017 WL 5068157, at *2 (S.D. Tex. Oct. 30, 2017). When the anesthesiologist, like Thomas, refused to agree to the terms of reappointment, her credentials expired. She alleged discrimination. But because her staff privileges had expired

---

In June 2018, a Caucasian female physician with six Event Reports was already before the Peer Assistance Committee and had been referred to counseling and meetings with the nursing coordinator in her hospital area. Her credentials were renewed for six months. After showing cooperation and improvement, she was reappointed for a year in December of 2019 and received a fill [sic] 2-year appointment in December of 2019.

In December of 2017, a white male physician was the subject of four Event Reports. He had been counseled on all of the complaints, but was only renewed for 6 months so committee could look for improvement.

Defs.' App. 27, ECF No. 83; Cook Br. 39, ECF No. 80. Even one of Thomas's proposed comparators, Dr. ▇▇▇▇▇, a "white male of Hispanic heritage" was referred for counseling as a condition of reappointment after he received multiple event reports. Pl.'s App. 411, ECF No. 85; Pl.'s Resp. 50, ECF No. 84.

[98] *See id.* Plaintiff alleges the terms of his reappointment were discriminatory and retaliatory. Pl.'s Resp. 44, ECF No. 84. This is belied by evidence that Defendants have consistently required counseling, check-ins, training, and monitoring when reviewing and reappointing physicians who have received multiple event reports. As explained in footnote 97, Defendants placed similar reappointment terms on male, female, white, Middle Eastern, and black physicians alike.

17

as a result of her own inaction, the court found she had not suffered an adverse employment action. *Id.* at *6.

*Third*, Thomas himself agreed to a similar plan with extraordinarily successful results less than a decade ago.[99] In 2013, Thomas had not only complied with the counseling requirement in his six-month reappointment but had made such remarkable improvements that he regained regular two-year reappointments, received virtually no complaints over the next few years, and eventually took on leadership positions at Cook. Based on his experience, Thomas could have anticipated similar results here.

Temporarily shortened reappointment periods are not punitive. Instead, they served two purposes: first, to allow the Credentials Committee to review the event reports from the previous period, and second, to alert Thomas that his behavior needed to change. Over the course of Thomas's career at Cook, the Committee renewed Thomas's employment for shortened periods at least six times.[100] If he satisfactorily completed his check-ins, coaching, and seminar, Thomas could expect Defendants would resume his typical two-year reappointments.

*Fourth*, and finally, Thomas's constructive discharge theory fails because "[c]onstructive discharge requires a greater degree of harassment than that required by a hostile environment claim." *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). Thomas has already failed to provide evidence of a hostile work environment, and this Court dismissed those claims in its order on Defendants' motion to dismiss.[101]

---

[99] Defs.' App. 42, 160, ECF No. 83.
[100] A shortened period is anything less than the default two-year reappointment. The Committee renewed or extended Thomas's credentials for one year in 2011, ninety days in 2012, six months in 2012, six months in 2013, remainder of the two-year cycle ending in 2015, and ninety days in 2019. *See id.* at 22, 149, 150–53, 160.
[101] *See* ECF No. 21.

For these reasons, Thomas has not satisfied the constructive discharge standard under the adverse action requirement. If counseling, training, and ongoing check-ins were so intolerable as to make resignation the only reasonable alternative, Thomas and his peers would not have routinely agreed to them.

## 2.  Demotion

In the alternative, Thomas argues that he satisfies the adverse employment action requirement because he was demoted. Thomas alleges that by requiring him to meet biweekly with nursing administrators Valerie Gibbs and Orlando Chapa, Defendants placed non-physicians in supervisory roles over him.[102] Because he believes he would be supervised by nursing staff, Thomas argues he experienced a "demotion with respect to prestige and reputation."[103]

Defendants explain that Thomas was not demoted, because his job, title, job duties, and existing reporting structure did not change.[104] They argue that Thomas mischaracterizes Gibbs's role; she was not "just 'a nurse,'" but was, in fact, Director of Perioperative Services, a role that required her to manage "all aspects of [Cook]'s operating rooms other than the actual practice of medicine."[105] Defendants contend that meetings with Gibbs were not supervisory. Rather, the purpose was merely to address the concerns of each party and resolve communication issues before they grew into larger problems.[106]

Demotion is unquestionably an adverse employment action. In fact, "a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement."

---

[102] Pl.'s Resp. 45, ECF No. 84.
[103] *Id.* at 45 (citing *Garrison v. Tex. S. Univ.*, No. CIV.A. H-11-2368, 2012 WL 5351216 (S.D. Tex. Oct. 23, 2012)).
[104] Cook Reply 11, ECF No. 87.
[105] *Id.*
[106] *Id.*; Defs.' App. 75, ECF No. 83 (Gibbs: "The purpose of the proposed meeting was to provide a quick and direct line of communication between Dr. Thomas and the operating room staff.").

*Alvarado*, 492 F.3d at 613. But here, Thomas was not transferred. He does not dispute that his job title and job duties did not change.[107] He continued to report to his direct supervisor, ███████. Adding a biweekly meeting to an otherwise unchanged role is not a "demotion" under the Fifth Circuit's criteria.

While Thomas argues he "lost his medical independence," in reality, Gibbs had no authority over Thomas's practice.[108] Defendants repeatedly reassured Thomas that the Credentials Committee—much less Gibbs—was not limiting his hospital privileges in any way.[109] While Gibbs submitted post-meeting reports, Thomas was not "hav[ing] his medical career determined by a nurse" as he alleges.[110] True, Gibbs was charged with reporting on the meetings and on Thomas's interactions with the operating room staff she supervised.[111] But even Thomas admits that providing reports to the Credentials Committee does not place a person in a supervisory role. Like Gibbs, Thomas's outside coach would be required to provide reports to the Committee, but when asked if considered himself a "subordinate to the coach," Thomas replied, "no."[112]

Thomas did not suffer a loss of "prestige" or "reputation" due to these meetings. The record provides no evidence that Thomas's peers even knew he was meeting with Gibbs. Whatever subjective loss of dignity Thomas experienced is not objectively supported by the evidence. Thus, Thomas has not shown he experienced an adverse action by demotion.

### 3.   Compensation

Finally, Thomas argues Defendants reduced his compensation "by imposing such demanding requirements on biweekly and weekly requirements on him [sic] that he would be

---

[107] Cook Reply 11, ECF No. 87.
[108] Pl.'s Resp. 46, ECF No. 84.
[109] Defs.' App. 253, ECF No. 83.
[110] Pl.'s Resp. 46, ECF No. 84.
[111] Defs.' App. 331, ECF 83.
[112] Thomas Dep. 257:2–21, Defs.' Supp. 25–26, ECF No. 93.

denied the full benefit of the hybrid payment system with respect to Relative Value Units (RVUs)."[113] The RVU system at Cook incentivizes physicians to complete additional work for pay beyond their base salaries.[114] Thomas claims the terms and conditions of his reappointment were so time consuming that he could not accumulate RVUs to the same extent as his similarly situated peers.[115] Defendants point out that Thomas fails to (1) estimate how much time would be consumed by meetings and sessions, (2) quantify how much income he typically makes from extra work, or (3) show how attending meetings would hinder his workload.[116]

After briefing concluded, the parties submitted supplemental evidence.[117] There, Thomas argued he suffered more than mere "potential" loss of income: he worked 734 and 1,670 RVUs during two six-month periods, and the burden of ninety-six meetings—three per week over an eight-month reappointment period—would be "tremendous."[118] Meanwhile, Defendants argue that "the entire process could take 30 hours or less," including all meetings, seminars, and write-ups.[119]

Clearly, the parties have different understandings of the meeting requirements. The reappointment letter's ambiguous term "biweekly" is at least partly to blame for the confusion.[120] Defendants' calculation assumes meetings with Gibbs would occur "every other week" and that coaching would happen weekly for just two months of the eight-month reappointment period.[121] Thomas's calculation assumes "twice a week" meetings with Gibbs and weekly coaching for the entirety of the eight months.[122]

---

[113] Pl.'s Resp. 46, ECF No. 84.
[114] Pl.'s App. 14, ECF No. 85.
[115] Decl. of Thomas, *id.* at 289.
[116] Cook Reply 8–9, ECF No. 87.
[117] Defs.' Supp. 2, ECF No. 93-1; Pl.'s Supp. 2, ECF No. 96-1.
[118] Pl.'s Supp. 5, ECF No. 96-1.
[119] Cook Reply 10, ECF No. 87.
[120] *Usage Notes: The Ambiguity of "Biweekly" and "Bimonthly,"* Merriam-Webster, https://www.merriam-webster.com/words-at-play/on-biweekly-and-bimonthly (last visited Apr. 14, 2022).
[121] Cook Reply 10, ECF No. 87.
[122] Pl.'s Supp. 6, ECF No. 96-1.

But this factual dispute is immaterial. Drawing all reasonable inferences in favor of the nonmoving party, this Court finds that even if the reappointment letter requires ninety-six meetings, Thomas has not carried his burden to prove lost compensation as a result. He still fails to quantify how many hours he spends earning extra RVUs. He has not provided evidence that attending three meetings per week limits his availability to earn RVUs. Moreover, Thomas indicated that had he still been at Cook in the fall of 2020, he would have begun his master's degree at Duke without reducing his workload.[123] If each of his three weekly meetings lasted one hour each, three hours per week for eight months is almost certainly a lighter commitment than one year of graduate-level coursework, even if the program is "designed for working professionals."[124] If Thomas planned to complete an advanced degree without sacrificing RVUs—thus, his compensation—it is untenable to claim that three meetings a week constitutes a pay reduction.

For these reasons, Thomas has failed to establish he was constructively discharged, either as a result of demotion or pay reduction. Without constructive discharge, Thomas's voluntary resignation is not an adverse employment action. He has not satisfied the third element of the prima facie case of discrimination, and therefore, his discrimination claims under Title VII and Section 1981 must fail.

### b.    Comparators

Even if Thomas had experienced an adverse employment action, his claim would fail on the fourth element of the prima facie case. A plaintiff must show that he was replaced by someone outside his protected class or treated less favorably than similarly situated employees outside the

---

[123] Thomas Dep. 346:4–12, Pl.'s Supp. 46, ECF No. 97.
[124] *Id.*

protected class. *Ross v. Judson Indep. Sch. Dist.*, 993 F.3d 315, 322 (5th Cir. 2021). Thomas fails to do so.

Thomas has not alleged that he was replaced by a non-black employee. Instead, he claims he has identified similarly situated peers outside the protected class—in other words, comparators—who were treated more favorably. A plaintiff and his comparator must have (1) held the same job or responsibilities; (2) shared the same supervisor or had their employment status determined by the same person; (3) have essentially comparable violation histories; and (4) have engaged in conduct "nearly identical" to the conduct that resulted in plaintiff's departure. *Id.* at 322 (quoting *Lee v. Kan. City S. Ry.*, 574 F.3d 253, 260 (5th Cir. 2009)). A comparator's circumstances need not be "strictly identical," but "nearly" so. *Saketkoo v. Adm'rs of Tulane Educ. Fund*, __ F.4th __, No. 21-30055, at 7 (5th Cir. Apr. 21, 2022).

Thomas presents two comparators: Dr. ███ and Dr. ███[125] Thomas argues that ██ a white male pulmonologist, received twelve event reports and three complaints within a two-year period, and that these incidents were of a "more serious" nature than Thomas's.[126] He claims that the PAC (1) treated ██ more favorably by recommending a full two-year reappointment despite the event reports and complaints, and (2) imposed none of the "adverse conditions" that it imposed on Thomas.[127] But ██ is not a proper comparator for three reasons.

*First*, ██ received far fewer event reports than Thomas did. Historically, ██ had received almost no event reports. Prior to each of their two-year complaint sprees, Thomas accumulated at least thirty-two event reports and complaints in less than ten years, while ██ received only two event reports in the prior thirteen years.[128] Thomas incurred roughly fifty event

[125] Pl.'s Resp. 47, ECF No. 84.
[126] *Id.* at 48.
[127] *Id.*
[128] Defs.' App. 33–36, 141–51, ECF No. 83.

23

reports total, while the record indicates ██████ received no more than fourteen.[129] The data would have supported Defendants' choice to treat ██████ more leniently than Thomas—but Defendants did not choose to do so.

*Second*, the Credentials Committee limited ██████ reappointment in the same way as it limited Thomas's. ██████ received a ninety-day reappointment, and then a six-month extension as Defendants accommodated scheduling issues.[130]

*Third*, the PAC recommended remedial steps for ██████ just as it did for Thomas. The PAC asked ██████ to exclusively use Vocera to avoid future communication problems, meet with Dr. Mellina (or someone of his choosing) for counseling, and apologize for his behavior.[131] But here lies the key distinction. Unlike Thomas, ██████ complied. ██████ "was very receptive and agreeable to the recommendations made," and "made significant efforts to improve his interactions with staff."[132] Given the progress ██████ made, Defendants reappointed him to the full two-year term.[133]

Similar issues arise with Thomas's next proposed comparator, Dr. ██████████ a Hispanic male surgeon who was the Medical Director for the Pediatric Surgery Group—in other words, Thomas's direct supervisor.[134] A plaintiff's supervisor is not a valid comparator because, by definition, a plaintiff and his supervisor do not share the *same supervisor* or have their employment status determined by the same person. *Crosby v. Computer Sci. Corp.*, 470 F. App'x 307, 309 (5th Cir. 2012) ("[T]he district court correctly determined that Condit is not a valid comparator because he was [Plaintiff's] supervisor (and therefore did not have the same supervisor as [Plaintiff]).").

---

[129] *Id.* at 141–46, 148, 203–12, 224–44, 250; Pl.'s App. 317–23, ECF No. 85.
[130] Defs.' App. 25–26, ECF No. 83.
[131] Pl.'s App. 921–22, ECF No. 85-3; Defs.' App. 15–16 ¶ 47, ECF No. 83.
[132] Pl.'s App. 921–22, ECF No. 85-3.
[133] *Id.*
[134] Cook Reply 17–18, ECF No. 87.

Here, █████ as medical director for the group, was subject to a different reporting structure. Generally, a physician with multiple event reports would be counseled by his or her medical director.[135] But a medical director with multiple event reports "would be handled at a higher level," rather than within the PAC.[136] Even if █████ was not his supervisor, Thomas has not shown that █████ event reports were "nearly identical" in quantity or quality. Thomas identifies approximately twenty-nine event reports █████ received over his career but fails to mention that only six report abusive or inappropriate conduct with the staff.[137] Some event reports complain of third parties' behavior, or faulty equipment or supplies, only mentioning █████ as a witness.[138]

Defendants do not bear the burden of presenting comparators, but they have provided summaries of ten anonymous Cook physicians who underwent Credentials Committee review between December 2017 and December 2020.[139] The group contained black, white, Hispanic, Middle Eastern, male, and female physicians.[140] Each physician averaged between four and five event reports plus additional patient complaints.[141] None came close to Thomas's "totally unprecedented" nineteen event reports and two complaints in a single credentialing cycle.[142] Even so, a familiar pattern emerged in each review. The Credentials Committee reviewed the reports, referred to the PAC, and renewed the physician's credentials for a shorter period while the PAC

---

[135] Defs.' App. 3, ECF No. 83.
[136] For example, one of █████ event reports was referred to the PAC. Pl.'s App. 390, ECF No. 85. However, the PAC sent the matter up the chain to the President of Professional Staff, Dr. Honeycutt, and to the Chief Medical Officer, Dr. Cunningham. *Id.* These leaders met with █████ directly and addressed his behavior. *See* Cook Reply 17, ECF No. 87; Pl.'s App. 390, ECF No. 85.
[137] *See* Pl.'s App. 345–48, 351, 352, 366–68, 484, ECF No. 85.
[138] *See id.* at 333–39, 341–44, 349–50, 354–55, 379–83, ECF No. 85; Cook Reply 18, ECF No. 87.
[139] Cook Br. 38–40, ECF No. 80.
[140] Defs.' App. 25–28, ECF No. 83.
[141] *Id.*
[142] *Id.* at 6.

made its recommendations and monitored compliance.[143] The PAC required counseling and meetings, and the physicians complied.[144] In particularly egregious cases, the Credentials Committee allowed the physician's credentials to lapse or immediately suspended the physician after just one event report.[145] After receiving five event reports for inappropriate language towards patients, one white male surgeon faced far worse consequences than Thomas did. Defendants suspended him, reported him to the Texas Medical Board, and placed a permanent letter in his file.[146]

For these reasons, Thomas has failed to provide a comparator outside the protected class who has been treated more favorably under nearly identical circumstances.

### 2. Burden Shifting

Having failed to present a prima facie case of discrimination, Thomas cannot shift the burden under the *McDonnell Douglas* framework. Defendants need not present a legitimate, non-discriminatory reason, because there has been no adverse employment action against Thomas. *See McCoy*, 492 F.3d at 557. And even if there had, Thomas has presented no adequate comparators.

### B. Intersectional (Race Plus Sex) Discrimination Claim

Thomas's intersectional (race plus sex) discrimination claim fails for the same reasons. Thomas cannot present a prima facia case of discrimination, because the evidence does not support a finding of adverse employment action. Even if it did, Thomas falls short on the fourth element.

Discrimination at the intersection of race and sex ("sex-plus" discrimination) requires a plaintiff to show "unfavorable treatment relative to an employee of the opposite sex who also shares the 'plus-' characteristic." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038,

---

[143] *Id.* at 25–28.
[144] *Id.*
[145] *Id.*
[146] *Id.* at 28.

1048 (10th Cir. 2020). For example, for a black male alleging race-plus-sex discrimination, black females and white males are groups outside the plaintiff's protected class. *See Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032–34 (5th Cir. 1980) ("[D]iscrimination against black females can exist even in the absence of discrimination against black men or white women.").

Defendants allege that a white male comparator could only provide evidence of race discrimination, not sex-plus-race discrimination.[147] While the Fifth Circuit has not conclusively addressed the issue, the point is moot. Thomas has not identified a comparator of *any* race or sex whose circumstances were "nearly identical" to his. *See Ross*, 993 F.3d at 322. His two chosen comparators offer no evidence that Thomas was treated differently because of his status as a black man.[148] He has not presented evidence of white females or black females receiving more favorable treatment under similar circumstances, either. In fact, the record shows that two white female physicians experienced the same consequences as Thomas, even with far fewer event reports. In June 2018, the PAC required one of the women to attend counseling and meet with the nursing coordinator.[149] The Credentials Committee reduced her reappointment term to six months for monitoring.[150] Likewise, in September 2019, a white female physician with *no* event reports received a six-month appointment term, based on mere "concerns" about her treatment of staff in her previous employment.[151] Neither party presents a black female comparator. When the sole black male physician in the record—other than Thomas—received eight patient complaints, the Credentials Committee simply sent him a notification letter and renewed his privileges for the full

---

[147] Cook Br. 44, ECF No. 80.
[148] *See* discussion *supra* Section III.A.1.b.
[149] Defs.' App. 27, ECF No. 83.
[150] *Id.*
[151] *Id.* at 26.

two years.[152] Such favorable treatment of a member of Thomas's protected class undercuts his discrimination claim.

In short, Thomas's intersectional discrimination claim fails for the same reasons as his race discrimination claims. He lacks both an adverse employment action and comparators.

### C.  Retaliation Claims

Next, Thomas alleges retaliation under Title VII, Section 1981, and the Texas Labor Code. The *McDonnell Douglas* framework governs all three retaliation statutes. *Badgerow v. REJ Props., Inc.*, 974 F.3d 610, 618 (5th Cir. 2020); *Gorman v. Verizon Wireless Tex., LLC*, 753 F.3d 165, 170 (5th Cir. 2014) ("The substantive law governing Title VII and [Texas Labor Code] retaliation claims is identical."). Thomas bears the initial burden to present a prima facie case of Title VII retaliation. *Badgerow*, 974 F.3d at 618. "Once the plaintiff meets [his] initial burden, the burden shifts to the employer 'to articulate some legitimate, nondiscriminatory reason' for its actions." *Id.* at 619 (quoting *McDonnell Douglas*, 411 U.S. at 802). "If the employer proffers a legitimate, nondiscriminatory reason, the burden then returns to the plaintiff to prove that the employer's reason is pretext for unlawful discrimination." *Id.*

To establish a prima facie retaliation case, Thomas must show (1) that he engaged in activity protected by Title VII, (2) that a "materially" or "substantially" adverse action occurred, and (3) that a causal link existed between the protected activity and the adverse action. *Id.* at 617–18; *Welsh*, 941 F.3d at 826. Thomas says he engaged in protected activity "by submitting internal complaints of race and gender discrimination and harassment to Defendants."[153] Thomas argues

---

[152] *Id.*
[153] Compl. 41, ECF No. 1.

that Defendants retaliated against him for engaging in that protected activity by imposing "humiliating" and "punitive" conditions on his employment.[154]

Defendants do not dispute that Thomas meets the first element of the prima facie case; they acknowledge he engaged in protected activity.[155] But Defendants argue they are entitled to summary judgment on the second and third elements because Thomas has not suffered a materially adverse action, and there is no causal link between his complaints and the reappointment process.[156] In response, Thomas argues that (1) the terms of his reappointment (including counseling, meetings, and a seminar) would dissuade a reasonable physician from engaging in protected activity, and (2) this action was temporally connected to his complaints, creating "a domino-effect" resulting in termination.[157]

The Court finds that Thomas's retaliation claim fails on the third element because he can establish no causal link.

### 1.  Materially Adverse Action

For purposes of retaliation claims, the "substantially" or "materially" adverse action is defined more broadly than the "adverse employment action" required in the employment discrimination context. *Welsh*, 941 F.3d at 826 (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). A materially adverse action is one that is "likely to dissuade" employees from engaging in protected activity, like complaining of discrimination. *Burlington*, 548 U.S. at 70. Thomas argues that no reasonable physician would engage in protected activity if he knew his employer would require ongoing coaching, "impugn [his] authority and standing by requiring

---

[154] *Id.* at 38; Pl.'s Resp. 60, ECF No. 84.
[155] *See* Pl.'s App. 285–88, ECF No. 85 (detailing instances of protected activity between September 2019 and February 2020).
[156] Cook Br. 46–55, ECF No. 80.
[157] Pl.'s Resp. 59–62, ECF No. 84.

direct supervision by nursing administrators," or "impose a humiliating requirement to attend a course for distressed physicians."[158]

Thomas also claims that Defendants "retaliated" against him in a number of small ways, like directing Thomas to the employee intranet portal,[159] failing to respond to Thomas's approximately thirty-eight inquiries by 5:00 p.m. the same day,[160] and by "wanting to 'talk about this process' rather than responding to [his] itemized inquiries in writing,"[161] But inconveniences in communication amount to "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington*, 548 U.S. at 68. They do not rise to the level of actionable retaliation. *Id.* at 67.

In general, disciplinary coachings and write-ups are not materially adverse actions either. *Earle v. Aramark Corp.*, 247 F. App'x 519, 524–25 (5th Cir. 2007). Even a low performance evaluation, on its own, is not a materially adverse action. *Obondi v. UT Sw. Med. Ctr.*, No. 3:15-cv-2022-B, 2017 WL 2729965 (N.D. Tex. June 23, 2017). Here, the analogous event reports, complaints, and notice letters in the appointment process are not themselves materially adverse actions. Some factual dispute exists as to whether requiring a physician to attend counseling, meetings, and a seminar would, in fact, dissuade that employee from complaining of discrimination. A shortened reassignment period very well may dissuade a physician in Thomas's circumstances from engaging in protected activity. But even if a jury were to find in Thomas's favor here, he cannot satisfy the third element of the retaliation claim: causality.

---

[158] *Id.* at 60.
[159] Defs.' App. 240, ECF No. 83.
[160] *Id.* at 234–36.
[161] *Id.* at 251.

### 2. Causal Connection

At the prima facie stage, a plaintiff need not provide but-for causation to demonstrate that a causal link exists between the protected activity and the adverse employment action. *Brown v. Wal-Mart Stores E., LP*, 969 F.3d 571, 577 (5th Cir. 2020). An employee may satisfy the causation standard if he can show "close enough timing" between his protected activity and the adverse employment action. *Saketkoo*, No. 21-30055, at 12 (citing *Brown*, 969 F.3d at 578). Alternatively, he can show "cat's paw" causation if a person who has retaliatory animus uses a decisionmaker to bring about an intended retaliatory action. *See Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002).

The Fifth Circuit has found temporal proximity exists when an adverse action occurs "very close" in time to the protected activity. *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007). Even a gap of eight to ten months is too far removed. *Welsh*, 941 F.3d at 827–28; *Gorman*, 753 F.3d at 171.

Thomas cannot satisfy the temporal proximity requirement here. He claims he first complained of racial discrimination to his outside counselor, Dr. Mellina, in 2013 and 2014.[162] However, there is no evidence in the record suggesting that decisionmakers at Cook were notified of this allegation. Thus, Defendants are incorrect in arguing that the six-year interval between this purported complaint and Thomas's eventual departure is the correct period to assess.

Cook first became aware of Thomas's allegations of discrimination in September of 2018 when he contacted the Director of Employee Relations.[163] Assuming for the sake of analysis that Thomas's shortened reappointment was materially adverse, this action was taken over a year later

---

[162] *Id.* at 668.
[163] *Id.* at 85.

in September of 2019.[164] Under the Fifth Circuit's interpretation of temporal proximity, this one-year gap breaks causal chain. *See Welsh*, 941 F.3d at 827.

But 2019 is not the first time Defendants imposed a shortened reappointment and counseling requirement. Defendants took identical steps when Thomas accumulated event reports prior to 2012—*long before* he ever engaged in protected activity. The conditions of Thomas's 2019 and 2020 reappointments were no more onerous than those of his 2012 reappointment or those of his peers. Indeed, Defendants routinely implemented performance monitoring, shortened reappointment periods, and coaching to help physicians improve their interpersonal skills and return to full two-year terms.[165] Such measures were standard protocol at Cook.

Finally, Defendants have established a legitimate, nonretaliatory reason for limiting Thomas's reappointment. In the span of twelve years, Thomas accumulated about fifty event reports and patient complaints—a number to which no other Cook physician had come close. After giving him at least six opportunities to improve his behavior,[166] Defendants provided Thomas yet another chance in February 2020.[167] Thomas merely had to agree to reasonable steps towards performance improvement. He refused to do so.

### D.  Cat's Paw Theory and the Individual Defendants

Having failed to satisfy the prima facie requirements under discrimination and retaliation, Thomas likewise loses against the Individual Defendants. Without an adverse employment action under the discrimination claims and causation under the retaliation claims, there is nothing for

---

[164] Defs.' App. 213, 219, ECF No. 83.

[165] *Id.* at 13–15.

[166] The Committee renewed or extended Thomas's credentials for one year in 2011, ninety days in 2012, six months in 2012, six months in 2013, remainder of the two-year cycle ending in 2015, and ninety days in 2019. *See Id.* at 22, 149, 150–53, 160.

[167] *Id.* at 330–332.

which the Individual Defendants can be held liable, even if Thomas proved they were "employers" for purposes of the statute.

Thomas also fails to show that stray remarks influenced decisionmakers at Cook and resulted in discrimination or retaliation. Thomas alleges that "stereotyping" comments from two of his colleagues influenced the Credentials Committee's decision.[168] But the context of each comment indicates there was no discriminatory animus, and Thomas has provided no evidence that these remarks eventually led the PAC and the Credentials Committee—both of whom voted unanimously—to limit Thomas's reappointment. Without tying stray comments to the decision-making process, Thomas's "cat's paw" theory fails.

### IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** each of Defendants' Motions for Summary Judgment (ECF Nos. 58, 59) as to all remaining counts of Thomas's complaint and **DISMISSES** those claims.

**SO ORDERED** on this **2nd day** of **May, 2022**.

_____

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**

---

[168] *See* Pl.'s Resp. 51–52, ECF No. 84.